In re QINTEX ENTERTAINMENT, INC.;
Hal Roach Studios, Inc.; Qintex
Productions, Inc., Debtors.

OTTO PREMINGER FILMS,
LTD., Appellant,

v.

QINTEX ENTERTAINMENT, INC.;
Hal Roach Studios, Inc.; Qintex
Productions, Inc., Appellees.

In re QINTEX ENTERTAINMENT, INC.;
Hal Roach Studios, Inc.; Qintex
Productions, Inc., Debtors.

CAMPBELL–DEVON PRODUCTIONS,
INC.; George C. Scott, Appellants,

v.

QINTEX ENTERTAINMENT, INC.;
Hal Roach Studios, Inc.; Qintex
Productions, Inc., Appellees.

Nos. 90–56338, 90–56351.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 1991.

Decided Dec. 20, 1991.

David L. Neale, Levene and Eisenberg, Los Angeles, Cal., for appellant Otto Preminger Films, Ltd.

Stephen S. Monroe and Bonni S. Mantovani, Los Angeles, Cal., for appellants Campbell–Devon Productions, Inc., and George C. Scott.

Philip A. Gasteier, and Irv M. Gross, Robinson, Diamant, Brill & Klausner, Los Angeles, Cal., for debtors-appellees.

Before FARRIS, PREGERSON and TROTT, Circuit Judges.

FARRIS, Circuit Judge:

Otto Preminger Films, Ltd., Campbell–Devon Productions, Inc., and George C. Scott appeal the district court's orders approving the sale of the entertainment assets of the debtors pursuant to § 363 of the Bankruptcy Code. 11 U.S.C. § 363(b)(1) and (f)(1988). The question is whether the four Scott contracts and the Preminger agreement were executory. We affirm the district court ruling on the Scott contracts, but reverse and remand on the Preminger agreement.

On April 28, 1987, Preminger granted Hal Roach Studios Inc., the exclusive right to subdistribute five motion pictures and to colorize and subdistribute the colorized versions of four of the motion pictures. The subdistribution rights will terminate on June 26, 2011. Preminger retained creative control over the colorization process. Hal Roach was obligated to colorize two of the pictures by June 26, 1988, and the other two pictures by June 14, 1990.

The agreement, as modified by a letter agreement dated March 18, 1988, provided that Hal Roach was to pay Preminger $1 million dollars. Hal Roach would also pay a percentage of gross receipts to Preminger after it retained the first $2.3 million dollars of gross receipts and recouped certain expenses. Hal Roach was required to provide quarterly distribution statements detailing the gross receipts within thirty days of the end of a calendar quarter. The parties agreed that New York law would control their contractual relationship.

Hal Roach completed colorization of the first two films as scheduled. The second set of films was not colorized by June 14, 1990, and remain uncompleted today. Hal Roach has also failed to provide distribution statements for any period after October 19, 1989.

Between 1982 and 1986, Robert Halmi, Inc., (acquired by Qintex Productions, Inc., in 1988) entered into four television movie contracts with George C. Scott, an actor, and Campbell–Devon Productions, his agent. Each contract contained the same essential terms. Campbell agreed to act as "lender" for Scott and supply his acting services to Robert Halmi, the producer of each television movie. Robert Halmi agreed to pay Campbell and Scott a fixed fee for the acting services. In return, Campbell granted Robert Halmi "all rights of any kind or nature, whether now or hereafter known, in and to and derived from the product ... of Performer's services." Campbell also granted Robert Halmi exclusive rights to use and license Scott's name and likeness in connection with these particular movies. Robert Halmi was required to pay future royalties to Scott and Campbell for any distributions of the television movies after the first two network runs in the United States and Canada. Scott has completed his acting for each television movie.

On October 19, 1989, Qintex Entertainment, Inc., Hal Roach, and Qintex Productions, sought protection from creditors by filing voluntary petitions in bankruptcy un-

der 11 U.S.C. § 301 (1988). Hal Roach is a wholly owned subsidiary of Qintex Productions. Their bankruptcy petitions have been consolidated and jointly administered by the bankruptcy court. We will refer to appellee debtors as Qintex. That designation will also include Robert Halmi.

On September 11, 1990, the bankruptcy court entered an order pursuant to 11 U.S.C. § 363 that authorized the sale of all of Qintex's entertainment assets "free and clear of liens" to RHI Entertainment, Inc. Among the assets were the four television movie contracts and the Preminger agreement. The bankruptcy court order required Qintex to obtain further orders in connection with the sale, transfer, or assignment of Qintex's interests in agreements with third parties. For reasons unrelated to this appeal, the district court presided over Qintex's subsequent petitions. On October 15th, the district court heard Qintex's motion for an order authorizing the sale of Qintex's assets free and clear of third party financial interests. Preminger, Scott and Campbell objected. The district court ruled in favor of Qintex and approved the sale to RHI Entertainment.

The district court ruled that: (1) the Preminger letter agreement and the four Scott contracts were not executory within the meaning of 11 U.S.C. § 365(a) (1988); (2) Qintex's failure to colorize two of the four films was not a material breach of the Preminger contract; (3) Qintex's obligation in the Preminger agreement to subdistribute the films was severable from its colorization obligation; and (4) Qintex's obligation to colorize the remaining two films in the Preminger agreement was severable from its obligation to colorize the first two films. This appeal followed.

## DISCUSSION

### I. *Applicability of Section 365 to the Asset Sale*

The appeal questions the district court order[1] confirming the sale and transfer of

---

1. The district court issued separate orders to each appellant. Since the orders are almost identical in language, we will address them together.

the Scott contracts and the Preminger agreement to RHI Entertainment. Specifically, we must determine if the district court erred in finding that neither agreement was executory and therefore subject to the requirements of § 365 of the Bankruptcy Code. We review the district court's conclusions of law de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ Section 363 of the Code allows a debtor to sell assets of the estate, after notice and a hearing, including a sale of substantially all the assets of the estate. 11 U.S.C. § 363(b)(1). An executory contract does not become an asset of the estate until it is assumed pursuant to § 365 of the Code. *See* § 365(a); *In re Tleel*, 876 F.2d 769, 770 (9th Cir.1989) ("Unless and until rights under an executory contract are timely and affirmatively assumed by the trustee, they do not become property of the debtor's estate"). Therefore, the sale of Qintex's assets will not include any contract that is executory unless Qintex first assumes the contract.

■ Whether a contract is executory for a party in bankruptcy is a question of federal law. *In re Wegner*, 839 F.2d 533, 536 (9th Cir.1988). Although the Code does not specifically define the term "executory contract," the Supreme Court has defined it as a contract "on which performance remains due to some extent on both sides." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984). We have observed that executory contracts contain "obligations of both parties that are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *Wegner*, 839 F.2d at 536. Thus, we will only consider a contract executory if material unperformed obligations remain for *both* parties.

## II. *Preminger Letter Agreement*

■ We examine the unperformed duties and obligations of each party to determine the status of an agreement. We have held

that a computer software licensing agreement is executory. *In re Select–A–Seat Corp.*, 625 F.2d 290, 292 (9th Cir.1980). In *Select–A–Seat:* (1) the licensee was obligated to pay the debtor (licensor) five percent of annual net return from use of the software; and (2) the debtor was under a continuing obligation not to sell this software to third parties. *Id.; see also Wegner*, 839 F.2d at 537 (duty to pay money on one side is a material obligation sufficient to render a contract executory provided corresponding material obligations exist on the other side).

The Fourth Circuit found an industrial processes licensing agreement executory. *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043 (4th Cir.1985), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). The court in *Lubrizol* held that the "unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory" for the debtor/licensor. *Id.* 756 F.2d at 1045. The court found the contract executory as to the licensee because it owed an "unperformed and continuing duty of accounting for and paying royalties for the life of the agreement." *Id.* at 1046. The court also observed that the promise to account for and pay future royalties went "beyond a mere debt, or promise to pay money, and was at the critical time executory." *Id.*

Licensing agreements are not, however, universally considered executory contracts. *See In re Learning Publications, Inc.*, 94 B.R. 763, 765 (Bankr.M.D.Fla.1988); *In re Stein and Day, Inc.*, 81 B.R. 263, 267 (Bankr.S.D.N.Y.1988). *Learning Publications* and *Stein and Day* involved book contracts between a debtor/licensee and the author/licensor. Both contracts contained clauses: (1) giving the debtor broad publication and distribution rights; and (2) giving the author royalties and accounting rights. *Learning Publications*, 94 B.R. at 765; *Stein and Day*, 81 B.R. at 266–67. The authors had written the books and performed their contractual obligations as of the date of the bankruptcy filing. Both courts held that these book contracts did

not constitute executory contracts because the author did not owe any remaining material duties to the debtor.

Qintex contends that the distinction hinges on the characterization of the debtor, not on the unperformed rights and obligations in the disputed contract. Qintex suggests that three cases where courts have found an executory contract, *Select–A–Seat, Lubrizol,* and *In re Chipwich,* 54 B.R. 427, 430 (Bankr.S.D.N.Y.1985), all involved a debtor/licensor. In contrast, Qintex cites several cases where the debtor was a *licensee* and the contract was not executory. *See Learning Publications,* 94 B.R. 763; *Stein and Day,* 81 B.R. 263.

We reject the attempt to portray the issue as one centered on the status of the two contracting parties. It turns on the particular rights and duties of each contracting party. *See In re Alexander,* 670 F.2d 885, 887 (9th Cir.1982); *Select–A–Seat,* 625 F.2d at 292. The existence of substantial and unperformed obligations on both sides determines this issue. Contrary to Qintex's claim, several bankruptcy courts have held that a licensing contract was executory even though the debtor was the licensee. *See In re Three Star Telecast, Inc.,* 93 B.R. 310, 312 (D.P.R.1988) (television program licensing agreement); *In re New York Shoes, Inc.,* 84 B.R. 947, 960 (Bankr.E.D.Pa.1988) (trademark contract); *In re Best Film & Video Corp.,* 46 B.R. 861, 869 (Bankr.E.D.N.Y.1985) (movie distribution contract).

Preminger's contract is an executory contract. The agreement contains several significant unperformed obligations. Preminger must refrain from selling the rights to subdistribute the movies to third parties, must indemnify and defend Qintex, and exercises creative control over the colorization and marketing of the pictures. Like the licensee in *Select–A–Seat,* Qintex is contractually obligated to give accountings and pay royalties for future sales of the pictures. Qintex has only colorized two of the four pictures. The Preminger contract

is executory and must be assumed or rejected by Qintex as provided in § 365.

III. *Materiality and Severability of the Preminger Agreement*

A. *Severability*

█ Severability is determined by the intent and actions of the contracting parties. As the New York Court of Appeals has observed: "Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." *Christian v. Christian,* 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 365 N.E.2d 849 (1977); *see also Rudman v. Cowles Comm.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *Nat'l Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 204–05 (2d Cir.1989).

The Preminger contract contains several clauses relating to severability: (1) Paragraph 3 provides a single expiration date of 2011 for the rights granted to Qintex for all four movies; (2) paragraph 5(c) authorizes Qintex to retain the first $2.3 million dollars of gross receipts from all pictures, future revenue from all pictures split 35% to Preminger and 65% to Qintex[2]; and (3) paragraph 12 requires a distribution statement covering all pictures for each calendar quarter. The Preminger contract does appear to apportion the initial one million dollar payment by Qintex to Preminger between the five films. (Agreement 5(b), Preminger E.R. at 352) However, paragraph five also notes that this division of money is "allocated for accounting purposes." *Id.*

The district court erred in finding that the Preminger agreement was severable. It cited no evidence to support its conclusion. In the absence of any facts in the record to support the district court's ruling, we must reverse.

B. *Materiality*

█ We review applicable state law to help determine the status of a contract.

**2.** The revised letter agreement provides that home video revenue of three of the pictures will

be divided 65% to Preminger and 35% to Qintex.

State law controls both the question of breach and construction of a contract. *In re Aslan,* 909 F.2d 367, 369 (9th Cir.1990). Whether one party's actions constitute a material breach must be determined by applicable state contract law. *Wegner,* 839 F.2d at 536.

■ Under New York law, a breach of a contract is material if it is so substantial as to defeat the purpose of the transaction or so severe as to justify the other party's suspension of performance. *Lipsky v. Com. United Corp.,* 551 F.2d 887, 895 (2d Cir.1976). The *Lipsky* court stated the test: "Would the innocent party have agreed to enter the contract without the inclusion of the disputed clause?" *Id.*

■ An essential term of the contract was the colorization of the four films. Qintex was also required to make accountings of all income derived from the agreement and to make royalty payments. Qintex admits that it has not colorized two of the four films. Qintex has also failed to provide Preminger with distribution statements for any period after October 19, 1989. These breaches of the contract are substantial and go to the heart of the agreement.

Qintex contends that the letter agreement does not contain termination provisions for the non-monetary defaults asserted by Preminger. While it is true that the agreement does not specifically cover non-monetary defaults, paragraph one of the letter agreement requires Qintex to colorize the second pair of pictures by June 14, 1990. Qintex has failed to do so. Qintex has materially breached the letter agreement. Qintex may, however, attempt to cure any defaults. We remand to the district court to allow Qintex to assume or reject the Preminger contract pursuant to the conditions specified in § 365(b)(1).

## IV. *The Scott Contracts*

■ We held in *Select–A–Seat* that the licensing contract was executory because the licensor had the continuing obligation not to sell its software packages to other

parties and the licensee had an obligation to pay specified royalties. *Select–A–Seat,* 625 F.2d at 292. Scott and Campbell properly point out that the four contracts all contain: (1) a royalty obligation contingent upon future distributions of the movies outside Canada and the United States; (2) a promise by Scott and Campbell not to sell any production rights to third parties; and (3) obligations to indemnify for breaches and cooperate in joint defense with Qintex.

In spite of these facts, we affirm. Scott and Campbell have contractually given all their future rights to Qintex. Scott and Campbell signed away "all rights of any kind or nature, whether now or hereafter known, in and to and derived from the product ... of [Scott's] services hereunder and all material contained therein, in all media throughout the world...." (Scott Contract ¶ 5.1) In *Select–A–Seat,* the debtor owned the software but was under a "continuing obligation not to sell its software to third parties." *Id.* at 292. Scott and Campbell lack any future rights to the fruits of Scott's acting services.

At the time of the bankruptcy filing, Scott had finished acting for the four television contracts. Campbell and Scott, like the authors in *Learning Publications* and *Stein and Day,* had substantially completed their duties under the contracts. The four television contracts contain no substantial unperformed duties owed by Scott and Campbell to Qintex. *See In re Munple,* 868 F.2d 1129 at 1130–31 (9th Cir.1989) (services rendered after the signing of a commission agreement by a brokerage firm were not essential to the contract and therefore did not render contract executory). The record supports the district court's order that the Scott contracts were not executory and were properly sold pursuant to § 363.

## V. *Good Faith Requirement of § 363*

Campbell and Scott also contend that the asset sale of Qintex to RHI Entertainment violated a good faith requirement of the Code.[3] They argue that Qintex sold its

**3.** Campbell and Scott do not specify what good faith requirement was violated by Qintex's

assets to a new entity controlled by principals from Qintex in an effort to retain the same management while removing some of the liabilities. Campbell and Scott assert that the sale was made in bad faith because Robert Halmi was a principal in both the buyer and the seller.

A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of a material fact. *Hunt v. Nat'l Broadcasting Co.*, 872 F.2d 289, 292 (9th Cir. 1989). Here, Campbell and Scott complain that: (1) the district court failed to permit their reply brief to Qintex's reply brief; and (2) they were precluded from raising their good faith argument in the district court. Both of these arguments lack merit.

■ The local rules for district court practice in the Central District of California do not require the district court to allow a reply brief to a responding party. Local Rule 7.7 allows reply briefs but does not require the court to permit a reply to a movant's reply brief. The district court did not abuse its discretion by refusing to permit Scott and Campbell's response to Qintex's reply brief.

■ Contrary to Campbell and Scott's contention on appeal, they made a good faith objection in their opposition brief to Qintex's motion for approval of the asset sale to RHI Entertainment. (Scott E.R. at 202) In response, Qintex offered several affidavits to prove that Halmi and his son had no involvement in the sale of Qintex's assets to RHI Entertainment. (Scott E.R. at 323) The district court could properly infer that the sale was an arms-length transaction and not in violation of any good faith requirement of the Bankruptcy Code. We find no abuse of discretion.

## CONCLUSION

The district court erred in approving the sale of the Preminger agreement to RHI Entertainment. We reverse the district court's approval of the sale of the Preminger contract and remand for Qintex to assume or reject the contract. We affirm the sale of the four Campbell and Scott television movie contracts to RHI Entertainment.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Each party shall bear its own costs.

§ 363 sale to RHI Entertainment. Section 363(m) states, in pertinent part: "The reversal or modification on appeal of [a § 363 sale] does not affect the validity of [a § 363 sale] to an entity that purchased or leased such property in good faith...." By its plain language, § 363(m) deals with the buyer, not third party creditors like Campbell and Scott. They appear to be challenging the September 11th order that certified RHI Entertainment as a good faith purchaser of the assets of Qintex. Thus, we review their challenge to the district court's actions relating to the issue of the buyer's good faith.