### In re EXIDE TECHNOLOGIES et al., Debtors.

### No. 02–11125–KJC.

United States Bankruptcy Court, D. Delaware.

April 3, 2006.

James E. O'Neill, Esquire, Kathleen Marshall DePhillips, Esquire, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., Wilmington, DE, Matthew N. Kleiman, Esquire, Kirkland & Ellis, LLP, Chicago, IL, for Debtor.

Thomas G. Whalen, Esquire, Stevens & Lee, P.C., Wilmington, DE, Robert Lapowsky, Esquire, Stevens & Lee, Philadelphia, PA, for EnerSys.

David B. Stratton, Esquire, David M. Fournier, Esquire, Pepper Hamilton, LLP, Wilmington, DE, Fred S. Hodara, Esquire, Elaine M. Laflamme, Esquire, Mitchell P. Hurley, Esquire, Mary R. Masella, Esquire, Jeffrey M. Anapolsky, Esquire,

Akin, Gump, Strauss, Hauer & Feld, LLP, New York, NY, for the Official Committee of Unsecured Creditors.

## OPINION [1]

KEVIN J. CAREY, Bankruptcy Judge.

## INTRODUCTION

Exide Technologies, Inc. and its affiliated debtors, as debtors and debtors in possession in the above-captioned matter (collectively "Exide"), seek approval from this Court to reject certain agreements entered into with EnerSys, Inc. ("EnerSys").[2] EnerSys vigorously opposes Exide's decision to reject, contending that the agreements are not executory and that even if they are, Exide did not exercise proper business judgment in making such decision. After an arduous and lengthy pre-trial period, hearings were held on March 3, 4, 5, 12, 17, 25, 26 and 31, 2004, to consider Exide's rejection of the agreements.

For the reasons set forth below, I will approve Exide's decision to reject the agreements.

1. This Opinion constitutes the findings of fact and conclusions of law required by FED. R.BANKR.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A) and (O).

2. Upon the Debtor's motion (Docket No. 17), the Court entered an Order (by my predecessor in this case, The Honorable John C. Ackerd) (Docket No. 62) establishing a procedure for rejection of executory contracts, pursuant to which Exide now has filed the four Notices of Rejection (Docket Nos. 1614, 1615, 1617 and 1618). For ease of reference, these Notices will be referred to collectively as Exide's "Motion" or "Motion to Reject."

At the time Exide entered into the agreements with EnerSys, Exide's name was Exide Corporation. However, after it merged with GNB Technologies, Inc. in 2000, Exide changed its name to Exide Technologies. EnerSys was known as Yuasa Battery (America),

## BACKGROUND

In 1991, Exide entered into a series of agreements with EnerSys for the sale of substantially all of Exide's industrial battery division. The parties executed over twenty-three agreements as part of the transaction. The following four agreements are at the heart of this dispute: (1) the Trademark and Trade Name License Agreement, dated June 10, 1991 ("Trademark License"), (2) the Asset Purchase Agreement, dated June 10, 1991, (3) the Administrative Services Agreement, dated June 10, 1991, and (4) a letter agreement, dated December 27, 1994 (collectively, all four are referred to herein as the "Agreement").[3] I ruled previously that the Agreement is a fully integrated, unambiguous document. See 11/20/03 Tr. 25:23–26:4; 3/12/04 Tr. 3:18–4:22.

As part of the transaction, EnerSys paid in excess of $135 million at closing. In exchange for such payment, EnerSys received various assets, including manufacturing plants, equipment and certain intel-

Inc. at the time the agreements were executed. Sometime afterward, Yuasa Battery (America), Inc. changed its name to Yuasa-Exide, Inc. and merged with Yuasa, Inc. in 1998. Yuasa, Inc. survived the merger and in 2000 changed its name to EnerSys. For the purposes of this Opinion, the terms Exide and EnerSys will include their predecessors when applicable.

3. Exide also sought to reject two other agreements, (I) the Administrative Services Agreement dated April 1, 1992, and (ii) the Miscellaneous Services Agreement dated April 1, 1992. Enersys did not oppose Exide's rejection of the Miscellaneous Services Agreement and withdrew its objection to rejection of the 1992 Administrative Services Agreement. EnerSys asserts that neither of these two agreements remain in effect and that neither is related to the 1991 transaction. EnerSys Trial Brief at 3, n. 3.

lectual property rights. Certain Exide employees in the industrial battery division became EnerSys employees.

Exide owns a trademark that it used in connection with its transportation battery business (the "Exide mark").[4] Exide wanted to continue to use the Exide mark outside of the industrial battery business. Conversely, EnerSys wanted to use the Exide mark in the industrial battery business. To accommodate the needs of both parties, Exide granted EnerSys a perpetual, exclusive, royalty-free license to use the Exide mark in the industrial battery business. This way, Exide retained ownership of the mark and could use it outside the industrial battery business and EnerSys could use the mark exclusively within the industrial battery business. The license of the Exide mark was subject to certain conditions and could be terminated as set forth in the Agreement.

For almost a decade following the closing of the transaction, the parties enjoyed a relatively amicable business relationship. In the year 2000, the parties agreed to the early termination of a ten-year noncompetition agreement, which termination allowed Exide to re-enter the industrial battery business. Shortly after the noncompetition agreement was terminated, Exide re-entered the industrial battery business when it purchased GNB Industrial Battery Company.

Prior to re-entering the industrial battery business, Exide's strategic goal was to unify its corporate image, including all of its brands that it used on the various products that Exide produced. The single name and mark that Exide wanted to use

was "Exide." Its corporate name was Exide and Exide believed that there was significant goodwill attached to that name. However, EnerSys had the exclusive right to use the Exide mark in the industrial battery business. Exide made several unsuccessful prepetition overtures to EnerSys in attempts to regain the Exide mark. Exide's chapter 11 proceeding now provides it with the opportunity to regain the Exide mark by rejecting the Agreement. EnerSys has objected to the rejection.[5]

## DISCUSSION

The Court is called upon to determine whether the Agreement is an executory contract and, if so, whether Exide exercised proper business judgment in rejecting the Agreement.

### I. Rejection of the Agreement.

An executory contract must be assumed or rejected *in toto*. *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 41 (3d Cir.1989); *In re Teligent, Inc.*, 268 B.R. 723, 728 (Bankr.S.D.N.Y.2001). A contract will not be bifurcated into parts that will be rejected and those that will not. *See In re Metro Transp. Co.*, 87 B.R. 338, 342 (Bankr.E.D.Pa.1988). Correspondingly, all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract. *See Philip Servs. Corp. v. Luntz (In re Philip Servs., Inc.)*, 284 B.R. 541, 547–548 (Bankr.D.Del.2002), *aff'd* 303 B.R. 574 (D.Del.2003); *In re Karfakis*, 162 B.R. 719, 725 (Bankr.E.D.Pa.1993). EnerSys contends that rejection must be denied

---

4. For purposes of this Opinion, reference to the "Exide mark" includes those marks licensed to Enersys under the Agreement, as well as the trade name "Exide".

5. EnerSys's President and CEO, Mr. John Craig, described poignantly the tenor of this dispute when he testified that "Exide ... is trying to ... steal back the [Exide] trademark and I don't think that is fair." *See* 3/12/04 Tr. 176:1–4.

because Exide failed to reject all of the agreements executed between the parties (not just the agreements at the center of dispute in this case), but I have already determined that the Trademark License, the Asset Purchase Agreement, the Administrative Services Agreement, and the December 27, 1994, letter agreement all comprise one, integrated agreement.

## II. *Is the Agreement Executory?*

■ Section 365(a) of the Bankruptcy Code allows debtors in possession to reject an executory contract.[6] *See* 11 U.S.C. § 365(a). The party seeking to reject a contract bears the burden of demonstrating that it is executory. *See DSR, Inc. v. Manuel (In re Hamilton Roe Int'l, Inc.),* 162 B.R. 590, 593 (Bankr.M.D.Fla.1993); *In re Rachels Industries, Inc.,* 109 B.R. 797, 802 (Bankr.W.D.Tenn.1990).

■ In determining whether a contract is executory and, hence, subject to rejection, courts in this Circuit utilize the Countryman standard, which provides that a contract is executory when "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973); *Sharon Steel,* 872 F.2d at 39; *In re Waste Systems Int'l, Inc.,* 280 B.R. 824, 826–827 (Bankr.D.Del. 2002). "Thus, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365." *Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.),*

50 F.3d 233, 239 (3d Cir.1995). Consequently, I must determine whether both parties have unperformed material obligations under the Agreement. *See Columbia Gas,* 50 F.3d at 239; *Waste Systems Int'l,* 280 B.R. at 827; *In re Access Beyond Technologies, Inc.,* 237 B.R. 32, 43 (Bankr.D.Del.1999). In doing so, I look initially at the "four corners" of the Agreement. *See Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),* 2001 WL 1112308, at \*8, 2001 U.S. Dist. LEXIS 14755, at \*27 (S.D.N.Y. September 20, 2001) ("the executoriness analysis examines an agreement on its face to determine whether there are material obligations that require substantial performance from the parties").

■ "The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed." *Columbia Gas,* 50 F.3d at 240; *see Waste Systems Int'l,* 280 B.R. at 827; *In re HQ Global Holdings, Inc.,* 290 B.R. 507, 510 (Bankr.D.Del. 2003). Exide sought chapter 11 relief on April 15, 2002. To determine whether the Agreement contained any material obligations as of April 15, 2002, I must "consider contract principles under relevant nonbankruptcy law." *Columbia Gas,* 50 F.3d at 240 n. 10. The parties designated New York as their choice of law governing the Agreement.

## A. *Material Obligations*

■ Under New York law, an obligation is material if a breach of the same "would justify the other party to suspend his own performance, or … defeat the

---

**6.** 11 U.S.C. § 365(a) provides:

[e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject

to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976); *accord Bradlees Stores,* 2001 WL 1112308, at *2001 U.S. Dist. LEXIS 14755, at *25. That is, an obligation is material if it relates to the root or essence of the contract. *See Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne),* 114 F.3d 379, 387 (2d Cir.1997); *see also Philip Services,* 284 B.R. at 547. An obligation must be material at the time the agreement is executed.

■■■ Exide contends that the following are material obligations under the Agreement:

(1) Exide must refrain from suing EnerSys for trademark infringement for the use of the Exide mark (i.e., must permit EnerSys to use the Exide mark) ("the Use Grant");

(2) EnerSys must refrain from using the Exide mark outside of the industrial battery business ("EnerSys's Use Restriction");

(3) Exide must refrain from using the Exide mark within the industrial battery business ("Exide's Use Restriction");

(4) EnerSys must maintain a minimum level of quality for its products that contain the Exide mark ("the Quality Standards");

(5) Exide must make payments into a pension plan maintained for the benefit of its employees ("Pension Plan Obligation");

(6) Exide must maintain the registration of the Exide mark ("Registration Obligation");

(7) Exide and EnerSys must indemnify each other from and against certain costs, losses, liabilities, damages, lawsuits, claims, etc. ("Indemnification Obligations"); and

(8) Exide and EnerSys must cooperate with one another after the closing of the Agreement in order to effectuate certain provisions contained therein ("Further Assurances Obligations").

**1. Paragraph 13.6 of the Asset Purchase Agreement.**

■■■ EnerSys claims that paragraph 13.6 of the Asset Purchase Agreement makes clear that none of the foregoing obligations are material, because Exide's remedies are limited to those remedies contained in paragraph 13.6 of the Asset Purchase Agreement, which provides:

> *Exclusive Remedies.* The indemnification provided for in this Article XIII shall be the exclusive remedy available to any Indemnitee against any Indemnitor for any Damages hereunder to the exclusion of all other common law or statutory remedies, including without limitation the right to contribution under CERCLA or analogous state law; *provided,* however, that notwithstanding the foregoing, the parties hereby agree that failure of the parties to perform certain of their respective obligations under this Agreement or the Ancillary Agreements may result in consequences to the non-breaching party for which money damages may not be sufficient. In such case, the non-breaching party shall be entitled to seek specific performance and other equitable relief, which shall be cumulative and non-exclusive of any other remedy available to such non-breaching party pursuant to this Article XIII.

EnerSys contends that Exide does not have the right to terminate all future performance under the Agreement upon default because Exide's remedies are limited strictly to indemnification, or equitable relief, when monetary damages prove to be insufficient. If Exide cannot terminate its performance upon default, which element is necessary to satisfy the Countryman

test, EnerSys argues that the Agreement cannot be executory.[7]

Paragraph 13.6 of the Asset Purchase Agreement does not preclude Exide from terminating performance under the Agreement. When viewing paragraph 13.6 in relation to the other provisions of the Asset Purchase Agreement, it is apparent that paragraph 13.6 relates solely to claims for indemnification. The Asset Purchase Agreement contains a separate article regarding termination. Furthermore, the language of paragraph 13.6 suggests that the non-breaching party is entitled to equitable relief in addition to monetary relief with respect to any claim for indemnification. It does not, as EnerSys argues, limit a non-breaching party's remedies under the Agreement solely to indemnification or equitable relief.

### 2. Paragraph 8 of the Trademark License.

Paragraph 8 of the Trademark License provides:

*Termination.* Licensor shall have the right to terminate this Trademark License if (a) products covered hereunder and sold by Licensee in connection with the Licensed Marks fail to meet the Qaulity Standards, or (b) Licensee uses, assigns or sublicenses its rights under the Licensed Trade Name or the Licensed Marks outside the scope of the Licensed Business[8] and, in either such case, reasonable measures are not initiated to cure such failure or improper use within ninety (90) days after written notice from Licensor. Upon termination of this Trademark License, Licensee and its sublicensees shall, within a reasonable period of time not to exceed two (2) years, discontinue all use of the Licensed Marks and Licensee shall discontinue all use of the Licensed Trade Name and shall cancel all filings or registrations made pursuant to Paragraph 10 hereof and change its corporate or trade name registrations, if any, to exclude the Licensed Trade Name; provided, however, that if any failure to meet Quality Standards or improper use of, or assignment or sublicense of rights under, the Licensed Trade Name or Licensed Marks occurs in any jurisdiction other than the United States and is not remedied as permitted hereunder, this Trademark License will terminate only with respect to the jurisdiction in which such failure or improper use occurred.

EnerSys's Use Restriction and the Quality Standards are material, since both relate to the foundation of the Agreement.[9]

---

7. Exide argues that EnerSys is precluded from making this argument because EnerSys failed to identify it in response to Exide's contention interrogatories or at any time prior to its closing argument. Insofar as EnerSys failed to identify this argument until closing arguments, EnerSys waived its right to assert the same. *See, e.g., Thorn EMI N. America, Inc. v. Intel Corp.,* 936 F.Supp. 1186, 1191 (D.Del.1996), *aff'd,* 157 F.3d 887 (Fed. Cir.1998), *cert. denied* 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999) (holding that party is prevented from raising a claim or defense that was not adequately described in a response to a contention interrogatory or joint pre-trial order); *CPC Int'l, Inc. v. Archer Daniels Midland Co.,* 831 F.Supp. 1091, 1102–1103 (D.Del.1993), *aff'd* 31 F.3d 1176 (Fed.Cir.1994), *cert. denied* 513 U.S. 1184, 115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995) (finding that ADM waived the right to assert certain matters as defenses to CPC's claims of infringement by failing to identify them in response to CPC's interrogatories and by failing to include them in the draft pretrial order). Even were I to consider EnerSys's argument, the argument fails.

8. Licensed Business refers to the industrial battery business (*see* paragraphs 1[A] and [B] of the Trademark License).

9. *See* section II.A.3. of this Opinion, *infra.*

These restrictions are necessary because they protect Exide's, as well as EnerSys's, interests in the Exide mark. A default of either would result in a material breach. Therefore, EnerSys's agreement to refrain from using the Exide mark outside of the industrial battery business, as well as to maintain quality standards set for the mark, are material components to which EnerSys remained subject as of the petition date.

If EnerSys violates its Use Restriction or the Quality Standards, Exide may terminate the Trademark License. Contrary to EnerSys's contentions, a breach of its Use Restriction or the Quality Standards allows Exide to terminate the Agreement, not simply the Trademark License, because the Agreement is an integrated contract. Consequently, Exide may terminate the performance of any of its remaining obligations under the Agreement upon the breach of either obligation.

### 3. Conditions vs. Obligations

Alternatively, EnerSys contends that its Use Restriction and the Quality Standards are not obligations under the Agreement, but are conditions. Because the failure of a condition cannot result in a material breach, EnerSys argues that the Use Restriction and the Quality Standard cannot satisfy the Countryman test.

■■■■ There is a critical distinction in the law between the failure of a condition and a breach of a duty (i.e., a promise).[10] *See Columbia Gas*, 50 F.3d at 241. "While a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages." *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 113, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (N.Y.1984) (citing Restatement (Second) of Contracts § 225). A party is not in breach of contract if a condition does not occur unless that party is under a duty to cause the occurrence of such condition. *See Columbia Gas*, 50 F.3d at 241. Whether a particular term of an agreement imposes a duty or is a condition is a matter of contract interpretation. *Id.*, at 241.

#### a. *The Quality Standards.*

■■■■ Paragraph 5 of the Trademark License, which concerns the Quality Standards, provides, in relevant part, that:

> [l]icensee shall maintain the standards of quality set by Licensor for the conduct of the Licensed Business under the Licensed Trade Name and the goods bearing the Licensed Marks which Licensor established prior to the execution of this Trademark License (the "Quality Standards").[11]

It is apparent that the parties intended the Quality Standards to be an affirmative undertaking rather than a condition. EnerSys agreed affirmatively to maintain the standards of quality for the mark set by

---

**10.** "A promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 112, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (1984) quoting Restatement (Second) of Contracts § 2(1)(1981). "A condition, by comparison, is 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *Id.*, at 112, 472 N.Y.S.2d 592, 460 N.E.2d 1077 quoting Restatement (Second) of Contracts § 224 (1981).

**11.** Exide had established quality standards prior to the execution of the Agreement. *See* 3/3/04 Tr. 69:20–71:18.

Exide. As such, the Quality Standards are an obligation. *See, e.g., HQ Global Holdings,* 290 B.R. at 510 (noting that franchisees' duty to maintain quality standards under license was an obligation). EnerSys also argues that, even if the Quality Standards are material, Exide waived performance of EnerSys's duty to comply with the Quality Standards because Exide failed, *inter alia,* to enforce them. As a result, according to EnerSys, the Quality Standards cannot serve as a basis for executoriness to satisfy the Countryman test.

Paragraph 5 of the Trademark License also provides that:

[l]icensee agrees to furnish to Licensor, upon Licensor's request, representative samples of all labels, advertising materials and other associated materials used in the sale, offering for sale, or marketing of goods bearing the Licensed Trade Name or Licensed Marks to enable Licensor to confirm that the labeling and advertising meet the Quality Standards.

The evidence established that Exide did devote some effort at monitoring the quality of EnerSys's batteries bearing the Exide mark. Exide inspected EnerSys's plants and batteries, tested the batteries and received technical data about the batteries from EnerSys. *See* 3/3/04 Tr. 68:11–69:19. These efforts provided Exide with information about the quality of EnerSys's batteries. Exide was satisfied that EnerSys met the Quality Standards. Moreover, Exide was under no affirmative duty to track regularly and monitor the quality of EnerSys's products that contained the Exide mark to ensure that EnerSys was complying with the Quality Standards. Likewise, EnerSys's duty to

comply with the Quality Standards was not made contingent upon Exide's efforts at monitoring EnerSys's products.

The circumstances here demonstrate that the quality control measures exercised by Exide were sufficient.[12] There was no evidence that EnerSys was not complying with the Quality Standards. The record reflects that Exide did not receive any reports from within the industrial battery industry regarding any significant problems with the quality of EnerSys's batteries. If anything, the evidence established that EnerSys was making high quality products. Indeed, EnerSys claims that it is the leading manufacturer of motive power batteries in the world.

### b. *EnerSys's Use Restriction.*

Paragraph 2 of the Trademark License provides, in relevant part, that:

Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, ... a perpetual, exclusive, world-wide, royalty-free license to use the Licensed Trade Name as a corporate name or trade name within the scope of the Licensed Business, and a non-exclusive, perpetual, world-wide, royalty-free license to use the Licensed Trade Name in connection with the motorcycle battery business, but only as part of the trade name or corporate name "Yuasa–Exide, Inc." While retaining the corporate name "Yuasa–Exide, Inc.", Licensee may sell products in businesses other than the Licensed Business and the motorcycle battery business but Licensee shall not sell such products under the Licensed Trade Name and shall sell such products under an assumed name,

---

**12.** The level of control required depends upon the particular circumstances of each case. *See United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 (3d Cir., 1981). *Cf. Creative Gifts, Inc. v. UFO,* 235 F.3d 540, 548

(10th Cir., 2000) (holding that a licensee is estopped from arguing that the licensor lost its rights in its mark because the licensor did not exercise adequate quality control over licensee's use of the mark).

fictitious name or through some other mechanism whereby the Licensed Trade Name is not used before the public or trade in relation to such products.

Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, ... a perpetual, exclusive, world-wide, royalty-free license to use the Licensed Marks within the scope of the Licensed Business on and in connection with the goods for which such Licensed Marks are registered or as otherwise permitted under applicable law within the scope of the Licensed Business ...

Furthermore, paragraph 8 of the Trademark License provides, in relevant part, that:

Licensor shall have the right to terminate this Trademark License if ... Licensee uses, assigns or sublicenses it rights under the Licensed Trade Name or the Licensed Marks outside the scope of the Licensed Business ....

Under these two provisions, EnerSys is permitted to use the Exide mark within the industrial battery market. Although there is no affirmative undertaking by EnerSys actually to use the Exide mark, EnerSys is obliged to use the mark only in accordance with the terms of the Agreement. *See Novon Int'l, Inc. v. Novamont (In re Novon Int'l. Inc.)*, 2000 WL 432848, at \*4, 2000 U.S. Dist. LEXIS 5169, at \*12 (W.D.N.Y. March 31, 2000). EnerSys must observe the restrictions imposed by the grant of the license; the EnerSys's

Use Restriction is an affirmative undertaking, or, obligation. *Id.*

### 4. Materiality of the Obligations

Lastly, EnerSys contends that notwithstanding the terms of paragraph 13.6 of the Asset Purchase Agreement and paragraph 8 of the Trademark License, none of the obligations identified by Exide are material.

#### a. *The Use Grant.*

Pursuant to the Use Grant, Exide is obligated to allow EnerSys to use the Exide mark subject to the terms of the Trademark License. In connection with the Use Grant, Exide also agreed to prosecute all substantial claims of infringement and oppose all attempted registrations of potentially confusing trademarks, trade names or service marks (paragraph 17 of the Trademark License). This is a material obligation. *See, e.g., Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046 (4th Cir.1985), *cert. denied* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (holding that the licensor's contingent duty to defend infringement suits was a material obligation).[13]

#### b. *EnerSys's Use Restriction and the Quality Standard.*

For the reasons previously set forth, EnerSys's Use Restriction and the Quality Standard are ongoing material obligations.[14]

---

**13.** Exide also has an ongoing duty to refrain from suing EnerSys for infringement of the mark. *See Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 677 (9th Cir.1996); *Novon Int'l*, 2000 WL 432848, at \*4, 2000 U.S. Dist. LEXIS 5169, at \*12; *Access Beyond Technologies*, 237 B.R. at 43. This is important since a "licensor's promise to refrain from suing the licensee for infringement is the raison d'etre for a [trademark]

license." *Id.* A default by Exide in performing this duty would cause a material breach since EnerSys would no longer be getting the benefit of its bargain, i.e., the use of the mark. Thus, the Use Grant is a material obligation.

**14.** Exide also argues that the extensive negotiations surrounding the terms of the Trademark License evidences the materiality of EnerSys's Use Restriction and the Quality

#### c. *Exide's Use Restriction.*

The Use Grant gives EnerSys an exclusive license to use the Exide mark within the industrial battery business. It would be contrary to the terms of the Use Grant that Exide be permitted to use the Exide mark within the industrial battery business. Indeed, Exide agreed not to grant any licenses to third parties which would be inconsistent with EnerSys's use of the mark. This agreement, in and of itself, is a material obligation of Exide. *See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.),* 950 F.2d 1492, 1496 (9th Cir. 1991) (holding that the licensor's duty to refrain from selling the rights to subdistribute movies to third parties was a significant obligation); *Fenix Cattle Co. v. Silver (In re The Select–A–Seat Corp.),* 625 F.2d 290, 292 (9th Cir.1980) (holding that because of the exclusive nature of the license which the licensee received, the licensor was under a continuing obligation not to sell its software packages to third parties). Therefore, an agreement by Exide to for-

bear from using the Exide mark in the industrial battery business is a continuing, material obligation. *See, e.g., HQ Global Holdings,* 290 B.R. at 510 (holding that the franchisor's agreement to refrain from using the proprietary marks in the exclusive territories of the franchisees was an ongoing material obligation as of the petition date).

#### d. *Pension Plan Obligations.*

Under the Agreement, Exide was obligated to contribute to certain employee pension plans. Specifically, paragraph 7.2(b) of the Asset Purchase Agreement provides, in relevant part, that:

> With respect to all defined benefit plans maintained by Seller as of the Closing Date ... Seller agrees that it shall be solely responsible to employees and former employees of the Division with respect to pension benefits accrued thereunder as of the Closing Date. Seller agrees to vest the Subject Employees

---

Standard. In support of this argument, Exide sought to introduce certain exhibits (Exide exhibits. 27, 28, 29, 30, 31 and 32) relating to the negotiations of the Agreement and prior drafts of the Agreement. EnerSys objected to the admission of Exide exhibits 27–32 on the grounds that such documents violated the parol evidence rule.

According to New York law, "where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing." *Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 425 N.E.2d 805 (1981); *see Holland v. Ryan,* 307 A.D.2d 723, 724[, 762 N.Y.S.2d 740] (N.Y.App.Div. 4th Dept.2003); *see also In re Worldcorp[Worldcorp], Inc.,* 252 B.R. 890, 895 (Bankr.D.Del. 2000).

I have already concluded that the Agreement was a fully integrated, unambiguous document. Thus, the parol evidence rule is

applicable. *See Marine Midland Bank[–Southern],* 53 N.Y.2d at 387[, 442 N.Y.S.2d 417, 425 N.E.2d 805]; *see, e.g., Fr. Winkler KG v. Stoller,* 839 F.2d 1002, 1005 (3d Cir. 1988) (noting that before the parol evidence rule can be applied, there must be a determination as to whether the parties have adopted a writing as the final and complete expression of their agreement).

However, Exide offers exhibits 27–32 only to demonstrate the materiality or importance of the provisions of the Trademark License. Such evidence is not barred by the parol evidence rule. *See, e.g., Chevron U.S.A. Inc. v. El–Khoury,* 285 F.3d 1159, 1165 (9th Cir. 2002), *amended by, reh'g denied* No. 00–57126, 2002 U.S.App. LEXIS 9128 (9th Cir. May 14, 2002) (holding that the parol evidence rule does not bar the consideration of earlier draft agreements for purposes of demonstrating the parties' intent with respect to the importance of the terms in the agreement). Exide Exhibits 27–32 were not offered for the purpose of varying, contradicting or interpreting the terms of the Agreement.

immediately after such Closing Date in their accrued benefits, if any, under the Exide Hourly Employees' Pension Plan, the Exide Retirement Income Security Plan, and the Exide Corporate Pension Plan as of the Closing Date.

Furthermore, paragraph 7.3(a) of the Asset Purchase Agreement provides:

> With respect to the Exide Savings Plan (the "Savings Plan") and the Exide Salaried Retirement Plan (the "Retirement Plan"), except as otherwise provided, Seller agrees that it shall be solely responsible to Subject Employees with respect to benefits accrued thereunder as of the Closing Date. Seller further agrees to vest the Subject Employees immediately following such Closing Date in their respective accounts, if any, under the Savings Plan and the Retirement Plan. Seller shall contribute to each said plan, in accordance with the terms of said plans, all amounts attributable to employees and former employees of the Division which are owed to or under the plans as of the end of the plan year last preceding the Closing Date.

Exide submitted sufficient evidence at hearing demonstrating that it has been paying and will continue to pay millions of dollars to the Exide Hourly Employees' Pension Plan until there are no more participants in the plan.[15] *See* 3/4/04 Tr.

107:13–109:14. Contributions to pension plans are considered ongoing, material obligations. *See, e.g., In re The Bastian Co., Inc.,* 45 B.R. 717, 720–721 (Bankr. W.D.N.Y.1985) (finding that pension plan contributions were ongoing, material obligations). Failure by Exide to make contributions to the plans could subject EnerSys to claims by employees and EnerSys, in turn, could assert claims against Exide.[16] The Pension Plan Obligations are material, ongoing obligations under the Agreement.

### e. *Registration Obligation.*

Exide contends that it is obligated to maintain registration of the Exide mark under the Agreement. Specifically, paragraph 12 of the Trademark License provides, in relevant part, that:

> Licensor shall maintain Licensed Marks in accordance with Licensor's usual and customary business practices. In the event that Licensor intends in good faith to cease payment of maintenance fees for or otherwise allow to lapse any of the Licensed Marks in a particular country, Licensor will notify Licensee of its intention to take such action at least one hundred twenty (120) days in advance ... except in the case where Licensor intends to refile an application to register such Licensed Mark covering goods

---

**15.** EnerSys complains that Exide should be precluded from arguing that the Pension Plan Obligations demonstrate that the Agreement is executory because in its response to EnerSys's first set of interrogatories, Exide failed to identify pension plan contributions under paragraph 7.2 of the Asset Purchase Agreement (dealing with Defined *Benefit* Plans). In its response to EnerSys's interrogatories, Exide instead identified paragraph 7.3 of the Asset Purchase Agreement (dealing with Defined *Contribution* Plans) as a remaining material obligation under the Agreement. In addition, EnerSys claims that Exide did not present any evidence at trial concerning con-

tributions made pursuant to paragraph 7.3 of the Asset Purchase Agreement.

Although Exide may have identified erroneously the applicable benefit plan in its interrogatory response, I will not preclude use of the correct benefit plan and Exide's obligations in connection therewith. Exide supported its claim concerning its pension plan obligations from evidence that was introduced at hearing. EnerSys had ample opportunity then to challenge such evidence.

**16.** EnerSys acknowledged this much in its post-trial submissions. *See also* footnote 17, *infra.*

within the scope of the Licensed Business . . . .

EnerSys argues that the Registration Obligation is not really an obligation, since paragraph 12 also provides that if Exide intends to cease support of the Licensed Marks, all it need do is notify EnerSys in advance. Failure to maintain the marks or to give the appropriate notice could very well deprive EnerSys of the benefit of its bargain. I conclude that the affirmative duty to maintain the Licensed Marks and the added duty to give notice to EnerSys upon any expected lapse of the Licensed Marks, taken together, are material, ongoing obligations of Exide.

Moreover, under the Agreement, EnerSys must refrain from making an application for or otherwise attempting to register the Exide mark in the United States Patent and Trademark Office or other similar agency in any foreign country or state, except where required by law (*see* paragraph 10 of the Trademark License). EnerSys is also required to execute and obtain registered user agreements for countries which require registration of the use of a trademark under a license. These are an ongoing, material obligations of EnerSys.

f. *Indemnification Obligations.*

In the Agreement, the parties agree to indemnify each other against certain liabilities and cooperate in the defense of indemnified claims (*see* Article 13 of the Asset Purchase Agreement). In addition, EnerSys agrees to indemnify Exide against claims arising in connection with EnerSys's use of the Exide mark. These obligations to indemnify in the Agreement "carry significant burdens and create considerable benefits." *See Philip Services,*

284 B.R. at 549. Insofar as claims for indemnification can still arise under the Agreement (and the parties recognize the possibility of such),[17] the obligation to indemnify is ongoing and material since unperformed obligations remain under the Agreement for both parties. *See, e.g., Qintex Entertainment,* 950 F.2d at 1496 (holding that the licensor's duty to indemnify and defend the licensee was a significant obligation); *Richmond Metal Finishers,* 756 F.2d at 1046 (holding that the licensor's contingent duty of indemnifying the licensee was material); *Philip Services,* 284 B.R. at 549–550 (holding that indemnity provisions constituted ongoing, material obligations since neither party completed performance of the contract and obligations remained to be performed).

g. *Further Assurances Obligations.*

Paragraph 9.9 of the Asset Purchase Agreement provides:

Seller hereby acknowledges that its assistance may be required from time to time to enable Purchaser to record or perfect title in, or otherwise to consummate more effectively, the transaction contemplated in this Article IX with respect to the Assigned Marks, the Assigned Letters Patent, the Proprietary Rights, and the Intellectual Property Rights, and Seller agrees that after the Closing and at the request of Purchaser or its designee, at the cost or expense of Purchaser (except in relation to United States patents, trademarks and applications therefor), Seller will (or will cause its Affiliates, as applicable, to) use all reasonable efforts to execute and deliver such other documents and take such other actions as may reasonably be requested by Purchaser or its designee to record the transfer to Purchaser or its

---

**17.** EnerSys acknowledged in its post-trial submissions that if Exide failed to honor its obligations to contribute to the pension plans, it could seek indemnification from Exide for claims made by employees.

designee of the rights assigned herein, or otherwise to consummate more effectively the transactions contemplated in this Article IX.[18]

This common type of provision requires the parties to execute certain documents or undertake other acts to effectuate the intellectual property transactions provided for in the Agreement. This duty is ongoing, and, without such assurances, the parties may not be able to effectuate or maintain their intellectual property-related rights as required in the Agreement. Thus, the Further Assurances Obligations, even if seldom invoked, are ongoing, material obligations.

## B. *Performance of the Obligations*

EnerSys contends that no material obligations existed as of the petition date because both parties substantially performed the Agreement. I disagree. As discussed above, both parties had a number of material obligations under the Agreement to perform as of the petition date and, therefore, could not have rendered substantial performance. At a minimum, EnerSys remained obligated to use the Exide mark in accordance with the terms of the Agreement. *See Novon Int'l,* 2000 WL 432848, at *4, 2000 U.S. Dist. LEXIS 5169, at *12. The Agreement included a license and a license imposes a number of ongoing performance obligations on the part of the parties. *See In re Kmart Corp.,* 290 B.R. 614, 618 (Bankr.N.D.Ill.2003).

## C. *Sale vs. License.*

■ In a related argument, EnerSys claims that the Agreement evidences a "closed sale" transaction rather than a license and, therefore, cannot be executory. While there was a sale aspect to the Agreement, the Exide mark was not one of the assets that EnerSys purchased. Rather, the Agreement granted to EnerSys only a right to use the Exide mark. Title to the Exide mark remained with Exide despite the fact that EnerSys was granted a royalty-free, exclusive license.[19] EnerSys cannot transfer or sublicense it without Exide's consent.[20] Exide retained ownership and control over the use of the mark.

The Agreement was the result of an arm's-length transaction between two well-represented, sophisticated businesses. EnerSys might have bargained for an assignment of the Exide mark, if available, rather than only a license for the right to use it.[21] Indeed, EnerSys obtained assignments of other marks. The Agreement makes clear which marks were assigned (*see* paragraph and schedule 9.1 of the Asset Purchase Agreement) and which marks were licensed, such as the Exide mark (*see* paragraphs 2.1[c] and 9.5 and schedule 9.5 of the Asset Purchase Agreement). Moreover, the Agreement reflects that EnerSys purchased only those marks and other intellectual property that were to be assigned (*see* paragraph 2.1[a][vi] of the Asset Purchase Agreement).

18. Article IX of the Asset Purchase Agreement deals with intellectual property-related matters, including assignment and licensing.

19. *See* section III.B.4.a of this Opinion, *infra.*

20. EnerSys must seek Exide's consent to transfer or sublicense the Exide mark. *See Kmart Corp.,* 290 B.R. at 618 (finding that the licensee's duty to seek consent of the licensor to transfer the licensed material is an ongoing requirement of the licensee under the license agreement).

21. EnerSys complains that the license could not be structured as a sale because Exide also continued use of the mark for itself. This required that the transaction be structured as a license, under the express terms of which the license to be was "perpetual." A non-debtor party's expectation that its transaction will not later be unwound in bankruptcy is common, but not dispositive under § 365.

■ I conclude that the Agreement is a license with respect to the Exide mark: "[g]enerally speaking, a license agreement is an executory contract as such is contemplated in the Bankruptcy Code." *Novon Int'l*, 2000 WL 432848, at *4, 2000 U.S. Dist. LEXIS 5169, at *12; *accord Kmart Corp.*, 290 B.R. at 618. *See also Matter of Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1176 (7th Cir.1996) (trademark license was an executory contract); *HQ Global Holdings*, 290 B.R. at 511 (trademark license was an executory contract); *Blackstone Potato Chip Co., Inc. v. Mr. Popper, Inc. (In re Blackstone Potato Chip Co., Inc.)*, 109 B.R. 557, 560 (Bankr.D.R.I. 1990) (trademark license was an executory contract); *In re Chipwich, Inc.*, 54 B.R. 427, 430 (Bankr.S.D.N.Y.1985) (trademark license was an executory contract).[22]

### III. *Did Exide's Decision to Reject the Agreement Satisfy the Business Judgment Test?*

■ The propriety of a decision to reject an executory contract is governed by the business judgment standard. *See*

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, and Pacific R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *HQ Global Holdings*, 290 B.R. at 511; *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120–121 (Bankr. D.Del.2001); *Wheeling–Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 72 B.R. 845, 845–846 (Bankr.W.D.Pa.1987).

■ A court is required to examine whether a reasonable business person would make a similar decision under similar circumstances. *See In re Vencor, Inc.*, 2003 WL 21026737, at *3, 2003 Bankr.LEXIS 659, at *8 (Bankr.D.Del. April 30, 2003). This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate. *See Sharon Steel*, 872 F.2d at 39–40; *HQ Global Holdings*, 290 B.R. at 511; *In re Patterson*, 119 B.R. 59, 60 (E.D.Pa. 1990); *Wheeling–Pittsburgh*, 72 B.R. at 846.[23]

### A. *Exide's Decision–Making Process.*

■ Exide claims that its decision to reject the Agreement was the result of a

---

**22.** EnerSys attempts to distinguish those cases finding a trademark license to be an executory contract on the grounds that: (1) the licenses did not involve an integrated contract for the sale of a business, (2) the licenses involved continuing royalty obligations, or (3) there were cross-licenses. EnerSys's argument on all three grounds misses the point. First, that the Agreement is integrated is not dispositive. The issue of whether a number of agreements are integrated is separate from whether an integrated agreement is executory. *See Blackstone Potato Chip*, 109 B.R. at 560 (The court, considering a license agreement along with a number of side agreements, determined the integrated agreement was an executory contract). Second, that there may be no continuing royalty obligations or cross-licenses here is not dispositive, either. The relevant issue is whether any material obligations remain under the Agreement. So long as there are any material,

ongoing obligations, a license may be an executory contract.

**23.** As a leading bankruptcy treatise explained: [i]n the nonbankruptcy corporate law context, the business judgment rule is typically invoked after-the fact, when an allegedly improvident management decision has already been made and put into effect. In those cases, the courts concern themselves with the process by which the decision was made, not the wisdom or consequences of a decision that in retrospect turned out to be wrong. In contrast, in chapter 11, the business judgment rule is often invoked before-the-fact, when a trustee or debtor in possession proposes to undertake a transaction that is, or alleged to be, outside the ordinary course of business, or one that by statute requires court authorization, such as the assumption or rejection of an executory contract. In these cases, the courts are,

deliberative and thoughtful process. EnerSys contends, however, that Exide's decision-making was insufficient to satisfy the business judgment standard. The Court must not substitute its own judgment for that of Exide's. *See Vencor*, 2003 WL 21026737, at *3, 2003 Bankr.LEXIS 659, at *8.

Exide's chairman and CEO, Craig Muhlhauser, testified that it was his decision, ultimately, to reject the Agreement and he did so based upon the advice of his management team and his own business judgment.[24] *See* 3/4/04 Tr. 22:14–19. Muhlhauser testified that having unrestricted use of the Exide mark was necessary to achieve the goal of unifying Exide and, therefore, he believed the Agreement should be rejected. *See* 3/4/04 Tr. 22:23–23:6. Muhlhauser and other Exide officials believed Exide needed to "unify" so that it could compete effectively in the marketplace. *See* 3/3/04 Tr. 78:15–84:3, 179:5–16; 3/4/04 Tr. 35:17–36:22, 161:15–162:6, 175:14–176:13.

Furthermore, there was considerable testimony from members of Muhlhauser's management team (upon whom Muhlhauser relied) concerning Exide's pre-bankruptcy efforts in attempting to develop a strong, unified corporate name, unify its products under a common brand, and de-crease confusion in the marketplace. *See* 3/3/04 Tr. 85:4–110:22, 180:1–10. In Exide's view, critical to achieving these goals was getting the Exide mark back. *See* 3/3/04 Tr. 92:8–24, 98:23–102:7; 3/4/04 Tr. 23:1–6, 173:24–175:17. Exide officers approached EnerSys several times to discuss ways of returning the Exide mark to Exide. *See* 3/3/04 Tr. 98:23–99:11, 106:23–107:6; 3/12/04 Tr. 133:18–134:19. Based upon these longsought-after goals, Exide seeks to reject the Agreement. *See* 3/3/04 Tr. 116:14–18, 180:18–184:12.

The evidence reveals that Exide spent considerable time and effort in studying its business operations, customer relations, competitive positioning and its general needs in formulating its strategic goal. Exide undertook additional analyses concerning its decision to reject. These sales forecasts (contained in Exide exhibits 155, 156 and 157) (the "Forecasts") assessed the expected impact on Exide's business of this Court's decision to approve rejection. *See* 3/3/04 Tr. 110:23–111:4; 185:1–186:1. That these Forecasts were undertaken demonstrate Exide's efforts at reviewing its rejection decision.[25]

Based upon the foregoing, I conclude that Exide undertook appropriate steps in reaching its decision to reject the Agreement.[26] Exide's decision took into account

understandably, not only concerned with the process by which the decisions were made, but also with the effect the business decision will have on the estate and the chapter 11 process. 7 Lawrence P. King, Collier on Bankruptcy, ¶ 1108.07[2], at 1108–16 (15th ed. revised 2003).

24. Although the decision to reject was discussed with Exide's board, it does not appear that their express approval was sought. *See* 3/4/04 Tr. 29:23–25, 33:5–14.

25. EnerSys claims that the Forecasts are inadmissible because they are irrelevant and are based on hearsay. This argument lacks merit. *See* section III.B.1 of this Opinion, *infra*.

26. EnerSys offered exhibit 253, which was Exide's supplemental response to an interrogatory request, to demonstrate that Exide attempted belatedly to justify its decision to reject the Agreement. The exhibit concerned a meeting of Exide personnel at which confidential information was discussed. Exide objected to the exhibit's admission on the grounds that: (1) Exide did not rely on the information contained in the exhibit at trial, and (2) the parties expressly agreed that the information contained in the exhibit would not be part of the trial record, irrespective of

the potential benefits, as well as the harms, in rejecting the Agreement.

## B. *Impact of Rejection on the Estate.*

### 1. Qualitative Benefits of Rejection

EnerSys contends that Exide failed to demonstrate that the estate will benefit from rejection. Exide responds that rejecting the Agreement will result in both qualitative and quantitative benefits to the estate. Under the circumstances present, I conclude that the qualitative benefits alone, namely, brand unification and elimination of confusion in the marketplace, are sufficient to support the Debtor's decision to reject.

The evidence submitted by Exide demonstrates that brand unification will likely make Exide more competitive. Neil Bright, President of the Industrial Energy Business Unit of Exide, testified that the lack of brand unification has hurt Exide's customer relations and made Exide less competitive because of the increased costs that Exide's customers incur as a result of dealing with different battery brands. *See* 3/3/04 Tr. 78:15–79:6, 100:21–101:8, 108:12–109:9. Reducing Exide's customers' costs would certainly improve its current customer relations and may even increase its customer base.

Furthermore, Bright indicated that Exide risks losing market share because it is unable to "present a unified face [for all of its brands] in front of the customer." *See* 3/3/04 Tr. 79:1–6. In this sense, Exide's

---

which exhibit contained that information. Exide further claims that this Court endorsed this agreement between the parties. The information in EnerSys exhibit 253 apparently contains confidential information that Exide does not want disseminated to the public or, more importantly, shared with EnerSys.

After reviewing the record, it does not appear that there was an agreement between the parties to exclude the information contained in EnerSys exhibit 253 from admission into evidence. If anything, the parties disagreed over the use and admissibility of the information contained therein. Indeed, Exide's counsel commented during trial that the parties were like "two ships passing in the night" with respect to the use of the information contained in EnerSys exhibit 253. *See* 3/3/04 Tr. 26:1. The agreement that Exide alludes to in its post-trial submissions appears to concern inadvertent disclosures of documents that the parties agreed not to use. *See* 3/3/04 Tr. 26:6–28:1.

The fact that Exide did not rely upon the information contained in the exhibit at trial is irrelevant. Under Fed.R.Civ.P. 33, answers to interrogatories are admissible in evidence to the extent permitted by the Federal Rules of Evidence. Fed.R.Civ.P. 33(c); *see, e.g., Kelly v. Crown Equip. Corp.*, No. 91–1143, [1991 WL 208771, at *5,] 1991 U.S. Dist. LEXIS 14452, at *12 (E.D.Pa. October 4, 1991). A verified response to an interrogatory request, such as that contained in EnerSys exhibit 253, may be admissible as an admission by a party opponent under Fed.R.Evid. 801(d)(2). *See, e.g., Tamez v. City of San Marcos*, 118 F.3d 1085, 1098 (5th Cir.1997), *cert. denied* 522 U.S. 1125, 118 S.Ct. 1073, 140 L.Ed.2d 132 (1998). Clearly, EnerSys exhibit 253 is admissible under Fed.R.Evid. 801(d)(2)(A), since it is being offered against Exide and is a statement made by Exide (in its representative capacity, of course). EnerSys exhibit 253 is admissible and Exide's objection is overruled.

However, I recognize that the information contained in EnerSys exhibit 253 is confidential and that disclosure of the same may be inimical to Exide's competitive interests. Under appropriate circumstances, material introduced at trial may be safeguarded against disclosure afterwards. *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir.1993). *See also, e.g., Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 341–342 (S.D.Iowa 1993) (trial exhibits containing confidential technical and commercial information were to remain sealed from the public). At the request of the parties the entire record of this proceeding was ordered sealed. Certain witnesses, including some of the parties themselves, were excluded during certain testimony, resulting in various levels of confidentiality. It is appropriate to seal EnerSys exhibit 253 and any testimony relating thereto and make it available only to the Court and to counsel for the parties.

customers are having trouble making the connection that the different brands Exide is using are actually associated with Exide. *See* 3/3/04 Tr. 75:9–76:10; 3/4/04 Tr. 172:12–20. This problem is two-fold: (1) customers may not use products that they do not believe are associated with Exide and (2) customers do not believe that Exide has global capabilities (because Exide appears to be a fractured company) which, according to Exide, is what customers want. *See* 3/3/04 Tr. 96:14–97:3, 100:21–101:8, 177:5–8; 3/12/04 Tr. 90:4–9. Indeed, one of EnerSys's own witnesses testified that EnerSys had lost market share because of a lack of focus on a single brand. *See* 3/12/04 Tr. 89:8–22. By unifying the brand, Exide expects to diminish these problems and become more competitive. Thus, an increase in Exide's competitive advantage is a benefit to the estate.

Eliminating confusion in the marketplace with respect to the Exide mark will also benefit the estate.[27] Both Mitchell Bregman, the President of Exide Industrial Energy Americas Business, and Bruce Cole, the Vice President of Marketing for the Industrial Energy Business Unit, testified that Exide is continually having to explain to its customers that it does not produce industrial batteries that contain the Exide mark even though it is Exide. *See* 3/3/04 Tr. 181:17–182–16; 3/4/04 Tr. 170:5–24. Exide's customers do not understand why an industrial battery that contains the Exide mark is not manufactured by the company with the same name. *See* 3/3/04 Tr. 181:6–15. As a result of such confusion, Exide has devoted consid-

erable efforts at trying to reduce the confusion and differentiate its products. *See* 3/3/04 Tr. 182:6–15; 3/4/04 Tr. 171:1–24. By eliminating the confusion over the Exide mark, Exide will no longer have to continue with its efforts to reduce confusion (and incur any of the costs associated therewith) and can freely exploit the Exide mark. Cole testified that confusion over the Exide mark frustrates customers. *See* 3/4/04 Tr. 172:23–173:12. Like brand unification, elimination of confusion will likely improve Exide's customer relations.[28]

### 2. Quantitative Benefits of Rejection

While the qualitative benefits alone justify rejection, the quantitative benefits of rejection further support Exide's decision to reject the Agreement.

Exide's evidence suggests that achieving brand unification will decrease some of Exide's operating costs. Bright testified that Exide currently uses a large number of brands on its industrial batteries and that maintaining all of these brands is expensive. *See* 3/3/04 Tr. 101:9–15. Having only one corporate brand to maintain would likely decrease Exide's expenses and any reduction in expenses is a benefit to the estate. *See, e.g., HQ Global Holdings,* 290 B.R. at 512 (holding that reduction in the debtor's advertising costs was a benefit to the estate). Likewise, Exide's expert witness, Scott Phillips, testified that brand unification would increase Exide's effectiveness and efficiency in its marketing efforts, which could also reduce Exide's costs. *See* 3/4/04 Tr. 134:14–135:8; 141:7–142:19.[29]

---

**27.** The evidence establishes that there was confusion in the marketplace concerning the Exide mark.

**28.** While the evidence suggests that Exide's post-bankruptcy marketing efforts may have contributed somewhat to the confusion in the

marketplace, the confusion existed before such marketing efforts.

**29.** Phillips also testified that brand unification would permit Exide to pursue a variety of umbrella branding strategies. *See* 3/4/04 Tr. 134:14–135:8. Umbrella branding involves the use of a core brand in combination with

The sales analyses conducted by Exide demonstrate that rejection will likely benefit the estate; Exide will realize an increase in sales revenue from rejection. Exide believes that the information contained in the Forecasts demonstrates that rejection would result in an increase in its sales revenue. While the exact amount of any increase in revenue may be undetermined—whatever the amount—the estate will benefit. Exide will be allowed to use the mark in a business in which it was previously prohibited from so doing, and, in combination with its own name. Bregman testified that Exide believes its sales will increase by combining the Exide mark with its corporate name. *See* 3/3/04 Tr. 183:7–12.

 EnerSys argues that the Forecasts are inadmissible because much of the information contained therein (confidential material) has been redacted, thereby rendering such exhibits so unreliable as to be irrelevant. While significant portions of the analysis were redacted, perhaps diminishing the usefulness of the remaining information, the Forecasts still provide some useful information concerning the quanti-

other brand names or businesses. *See* 3/4/04 Tr. 135:14–136:1. According to Phillips, umbrella branding brings "greater focus and identity to the branding strategy of a company" and helps "create greater brand awareness, particularly in ... a global economy and where companies are increasingly dependent upon global customers." *See* 3/4/04 Tr. 136:2–9. However, Phillips conceded that umbrella strategies are not always appropriate, especially where there is a heightened need for local appeal. *See* 3/4/04 Tr. 152:16–152:13. While it is not entirely clear whether a global or regional branding strategy is better suited for the industrial battery industry, or the commercial power battery market in general, at least Exide will have the opportunity to exploit a global a strategy if it believes it is appropriate to do so. Having this option is a benefit to Exide.

30. Given that the parties are each other's main competitor and the information in the

tative benefit of Exide's decision to reject the Agreement.[30] Questions concerning the reliability, accuracy or completeness of a document go to the weight of the evidence, not its admissibility. *See Greener v. The Cadle Co.*, 298 B.R. 82, 92 (N.D.Tex. 2003). Based upon the foregoing, Exide Exhibits 155–157 are relevant.

 EnerSys claims that the Forecasts, even if relevant, are inadmissible because they do not meet the requirements of the business records exception to the hearsay rule.[31] Here, the testimonies of Bright and Cole establish that Exide employees prepared the Forecasts contained in exhibits 155–157 based upon Exide's own internal data. *See* 3/3/04 Tr. 111:19–112:8; 3/4/04 Tr. 184:25–201:1. Second, it appears that the information contained in the Forecasts was recorded at or near a time it was obtained. Third, both Bright and Cole testified that it was a routine practice for Exide to conduct such type of analyses. *See* 3/3/04 Tr. 112:17–112:21; 3/4/04 Tr. 186:8–186:17. Finally, Bright testified credibly that the information obtained from conducting analyses,

exhibits were confidential, it was necessary that Exide exhibits 155–157 contained redactions.

31. Exide seeks to admit exhibits 155–157 under the business record exception. Consequently, it does not appear that the parties dispute that Exide exhibits 155–157 are hearsay. EnerSys argues that the exhibits contain double hearsay in that Exide must not only establish that the exhibits themselves fall within the business records exception, but that the information from which the exhibits were created must also fall within one of the exceptions to the hearsay rule. The information contained in the exhibits was provided by Exide personnel (under a direction and duty to do so), rather than from any outside source, and was derived from Exide's own business data.

such as the ones contained in the Forecasts, to be reliable. *See* 3/3/04 Tr. 112:22–115:8. EnerSys argues that the Forecasts were neither the product of a regularly conducted business activity nor regularly kept in the ordinary course of business; the Forecasts were created solely for the purposes of the present litigation. Documents created expressly for the purpose of litigation do not fall within the business records exception because they lack the requisite indicia of reliability and trustworthiness that are necessary for the business records exception to apply. *See Palmer v. Hoffman,* 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1943), *reh'g denied* 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163 (1943); *United States v. Casoni,* 950 F.2d 893, 910–911 (3d Cir.1991); *Certain Underwriters at Lloyd's, London v. Sinkovich,* 232 F.3d 200, 205 (4th Cir.2000).

The Forecasts are a part of Exide's continual decision-making efforts concerning the proposed rejection. Obviously, it was important for Exide to conduct the analyses to quantify, as best it could, the effect of its decision to reject the Agreement and determine whether its decision to reject was appropriate.

EnerSys also contends that the testimonies of Bright and Cole concerning these exhibits and the analyses contained therein should be stricken from the record because they lack foundation. EnerSys argues that Bright and Cole did not perform any of the calculations or Forecasts contained in the exhibits and otherwise have no first-hand knowledge about them.

■■■■ Rule 803(6) of the Federal Rules of Evidence does not require that foundation evidence for the admission of business records be provided by the actual custodian of the records. *See United States v. Console,* 13 F.3d 641, 656–657 (3d Cir.1993); *United States v. Pelullo,* 964 F.2d 193, 201 (3d Cir.1992). Rather, "oth-

er qualified witnesses" are permitted to lay a foundation and those whom may fall within this rubric is broad. *See Console,* 13 F.3d at 657; *Pelullo,* 964 F.2d at 201. Indeed, a qualified witness need only have a familiarity with a business' record-keeping practices and be able to attest that:

> (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

*See Console,* 13 F.3d at 657; *Pelullo,* 964 F.2d at 201.

Based upon the record, Bright and Cole are both "other qualified witnesses" who are permitted to lay a foundation for the admission of Exide exhibits 155–157 as business records. Bright testified generally about the electronic data warehouse system ("the System") Exide used in gathering the information for the analyses contained in the exhibits, the purpose of System, how Exide uses the System, and the System's usefulness in his decision-making process. *See* 3/3/04 110:23–115:8. Cole further expounded upon the use and purpose the System, the origin of the data in the exhibits, the rationale of the analyses performed, and who prepared the analyses set forth in the exhibits. *See* 3/4/04 Tr. 184:25–201:1, 241:10–241:15. It is apparent from the record that Bright and Cole have sufficient personal knowledge of the System used to prepare the analyses contained in Exide exhibits 155–157, as well as the persons who prepared them; consequently, Bright and Cole may provide by their testimony the foundational requirements for the admission of business rec-

ords.[32] *See, e.g., United States v. Console,* 13 F.3d at 657 (the witnesses familiarity with the office record-keeping system enabled her to attest to each of the foundation requirements for the admission of an Accident Book as a business record). Exide exhibits 155–157 are relevant and admissible under the business records exception. Accordingly, EnerSys's objection is overruled and such exhibits will be considered by the Court.

In sum, the evidence demonstrates that there will be both qualitative and quantitative benefits to the estate from the rejection of the Agreement. I now consider whether EnerSys's potential rejection damage claim outweighs these benefits.

### 3. Rejection Damages

EnerSys argues that rejection of the Agreement will result in such a large rejection damage claim that it will outweigh any of the potential benefits identified by Exide. Exide contends that EnerSys has exaggerated its potential rejection damage claim because, *inter alia,* EnerSys did not take into account any mitigation of damages in calculating its rejection damages.

Both parties relied upon expert testimony concerning the potential impact of rejection on EnerSys and both seek to discredit the testimony of each other's experts.

The impact of EnerSys's potential rejection damage claim on the estate is relevant in determining the appropriateness of Exide's decision to reject.[33] *See, e.g., Vencor,* 2003 WL 21026737, at *3, 2003 Bankr.LEXIS 659, at *8–9 (holding that it was appropriate to consider the avoidance of a large rejection damage claim); *In re Sun City Invs., Inc.,* 89 B.R. 245, 249 (Bankr.M.D.Fla.1988) (denying the debtor's motion to reject a contract because rejection would create a large claim against the estate, which would not be in the estate's best interest). In reviewing the impact of a rejection damage claim, I not need determine the exact amount of EnerSys's rejection damage claim.[34] Rather, I need only determine if the rejection claim would be so large as to make Exide's decision to reject the Agreement unreasonable.

EnerSys claims that it will suffer more than $67 million in damages as a result of rejection.[35] In support of such claim, En-

---

**32.** I concluded already that Exide exhibits 155–157 qualify as business records.

**33.** In determining the benefit to the estate, the burden or impact that rejection will have on a nondebtor party is not a factor to be considered in determining the propriety of a decision to reject. *See Trans World Airlines,* 261 B.R. at 123; *Patterson,* 119 B.R. at 61; *Wheeling–Pittsburgh Steel,* 72 B.R. at 847. In other words, there is no balancing of the interests of the estate against the interests of other parties to the contract being rejected. *See Trans World Airlines,* 261 B.R. at 123; *Wheeling–Pittsburgh Steel,* 72 B.R. at 848; *see also, Patterson,* 119 B.R. at 61; *see also Robertson v. Pierce (In re Chi–Feng Huang),* 23 B.R. 798, 801–802 (9th Cir. BAP 1982). Thus, any negative impact of rejection on EnerSys itself is irrelevant in determining the propriety of Exide's decision to reject the Agreement.

**34.** The determination of the amount of EnerSys's rejection damage claim is not now before this Court.

**35.** EnerSys's rejection damage claim breaks down as follows:

*Harm to EnerSys if Rejection Summary*

| Damage Element | $ (In Millions) |
| --- | --- |
| Lost Price Premium (Price Erosion) | $37 |
| Incremental Cost— Switching to New Brand | $11 |
| Lost Investment | $11 |
| Lost Profit on Lost Sales | $12 |
| Total Damages | $71 |
| | |
| Present Value of Total Damages (as of 4/01/04) | $67 |

erSys presented two expert witnesses, Dr. Warren Keegan (marketing and branding expert) and Brian Blonder (valuation expert). Keegan's opinion pertained to his survey of the motive power battery industry, which survey measured the impact of rejection on the Exide brand and on Exide's marketing communications. Blonder's opinion concerned the effect of rejection, primarily focusing on the amount of damages EnerSys would incur as a result.

Exide contends that the testimony of Keegan and Blonder should be disregarded because they are wholly unreliable and incredible; however, Exide's objections go to the weight to be accorded such testimony, not its admissibility.[36] In considering the appropriate weight to accord each witness, a court may accept all of a witness' testimony, reject all of it, or accept some and reject other parts depending upon the credibility of the witness. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 179 (3d Cir.1991), *reh'g denied* 941 F.2d 154 (3d Cir.1991), *cert. denied* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992).

Keegan concluded that rejection will harm EnerSys because of marketplace confusion (*see* 3/12/04 Tr. 248:5–253:9); however, the imposition of a transition period will likely reduce, if not eliminate, such confusion. As such, Keegan's survey evidence does little to convince me that EnerSys will likely suffer the magnitude of damages asserted as a result of rejection, especially if measures are put into place that will mitigate marketplace confusion.

Blonder testified that his $67 million damage assessment would remain essentially unaffected by any change in the assumptions or conditions he relied upon in formulating his opinion. *See* 3/26/04 Tr. 87:13–90:2, 109:19–114:19. This position simply undermines Blonder's credibility, particularly when he opines that the damage claim would be unaffected by a transition period. If mitigation efforts, over time, are taken into account, EnerSys's rejection damage claim will likely be far less than $67 million.[37]

While the magnitude of possible damage to EnerSys as a result of rejection remains

---

**36.** *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir.1997).

**37.** Phillips' offered rebuttal testimony concerning the duration of harm in the lost advertising category of damages, set forth in Section VII of Blonder's expert report (entitled "Loss of Return on Historical Investment Brand"). EnerSys objected to this testimony on the ground that such testimony was precluded by a prior order of this Court. Specifically, this Court ordered Phillips to produce a certain advertising study upon which he was basing a portion of his opinion and, unless Phillips produced this study, Exide would be precluded from offering rebuttal testimony from Phillips relating to the duration of harm in Section VII of Blonder's expert report.

It is undisputed that Phillips never produced the advertising study. Further, Exide does not contest that Phillips is precluded from offering rebuttal testimony regarding the duration of harm in Section VII of Blonder's expert report because of Phillip's failure to produce the study. Thus, to the extent that Phillips rebuttal testimony relates to the duration of harm depicted in Section VII of Blonder's expert report, it is stricken from the record and will not be considered.

With regard to the remainder of Phillips' rebuttal testimony, EnerSys argues that it is flawed and without a credible basis. Phillips offered an analysis which calculated the fair value of the Exide mark to EnerSys. Phillips calculated the amount of this value to be $8.4 million. *See* 3/26/04 Tr. 172:5–173:4. Phillips testified that the damage EnerSys would suffer as a result of rejection would bear some relationship to this value. *See* 3/26/04 Tr. 174:19–175:10. While this "fair market" analysis may provide some perspective concerning the amount of EnerSys's true rejection damages, it is not necessarily a complete measure of damages in this instance. This "fair market" approach fails to capture all of the damages that a licensee may incur as a result of losing a trademark, such as the costs of creating and establishing a new mark.

undetermined, it is evident that EnerSys will not incur the magnitude of damages it claims or an amount even close to that figure. EnerSys's claim for damages is speculative at best. I conclude, based upon this record, and for purposes of the proposed rejection, that EnerSys's eventual unsecured damage claim will be substantially less than $67 million.

Even if EnerSys's $67 million claim were to be allowed, it will not have as large an impact on the estate as EnerSys suggests. That dollar amount, although large in absolute terms, must be compared to the approximately $900 million of unsecured claims filed in this case. *See* 3/31/04 Tr. 28:1–2. When viewed in a proper perspective, an additional $67 million will not diminish the dividend to unsecured creditors sufficiently to render Exide's decision to reject unreasonable.[38]

The most dramatic indication that rejection is in the best interests of creditors comes from the position taken by the unsecured creditors themselves. After close of the evidence, the Official Committee of Unsecured Creditors (the "Committee") filed a post-hearing statement (Docket No. 4202) fully supporting Exide's Motion to reject the Agreements.

In its Statement, the Committee says, *inter alia:*

. . . .

. . . general unsecured creditors would bear 100% of the rejection damages claims, but would own only 10% of the common stock of the reorganized Debtors plus warrants. Therefore, the burden and benefit of rejecting the Trademark License would have a disproportionate impact on general unsecured creditors. Each of the existing general unsecured creditors would be impacted by double dilution: (a) a diluted benefit because of the minority position in the reorganized Debtors' equity and (b) a diluted share of that minority position as a result of an increase in the aggregate amount of general unsecured claims once EnerSys's rejection damages are included. As such, the Debtors' decision to reject the Trademark License should be judged based on its impact upon general unsecured creditors because they are most directly and adversely affected. *See, e.g., In re Klein Sleep Products, Inc.,* 78 F.3d 18, 25 (2d Cir.1996) (judging rejection of executory contract using best interests of unsecured creditors); *In re Kong,* 162 B.R. 86, 96 (Bankr.E.D.N.Y.1993) ("Central to this showing 'is the extent to which a rejection will benefit the general unsecured creditors of the estate.' ").

4. The Committee is persuaded that rejecting the Trademark License provides a net benefit to general unsecured creditors even after accounting for the double dilution effects described above. This conclusion is based on EnerSys's failure to demonstrate that rejection of Executory License would result in the $65 million rejection damages claimed by EnerSys. EnerSys bears the burden of proof with respect to the size of its damages, but the Committee is not persuaded by EnerSys's supporting evidence. EnerSys's estimates of its damages are excessive, are unrealistic, and, most significantly, exclude EnerSys's legal obligation to mitigate its damages. Such mitigation is straightforward since Exide is offering EnerSys a transition plan whereby EnerSys can reduce its potential damages significantly. Therefore, the Committee is convinced that

---

**38.** The Debtor argues that, under Exide's plan, unsecured creditors will receive approximately 20 to 22 cents on the dollar. *See* 3/31/04 Tr. 28:10–11.

EnerSys's allowable claim against the Debtors' estates would be very small, especially since, among other things, the Debtors would be willing to accept a transition plan that is intentionally designed to minimize the loss of EnerSys's sales.

...Therefore, by authorizing and approving a transition plan as part of its ruling on the rejection of the Trademark License, the Bankruptcy Court would fulfill Congress' desire that bankruptcy courts use their equitable powers to provide appropriate remedies when trademark licenses are rejected by debtors.

Statement, ¶¶ 3–5.

■■■ It is particularly appropriate here to give substantial weight to the views of the general unsecured creditors, the *only* constituents (besides EnerSys) in this chapter 11 proceeding who would suffer any ill effects of rejection.[39] This support is a significant factor weighing in favor of permitting rejection. *See Wheeling–Pittsburgh Steel,* 72 B.R. at 850 (in upholding the debtor's decision to reject, the court noted that "quite significantly, the official committee of unsecured creditors, which has been very active in this case, supports the debtor's decision to reject the Contract. It cannot be supposed that the committee of unsecured creditors, which is duty bound to act in the best interests of unsecured creditors, would support a decision which is inimical to the best interests of the debtor's estate and unsecured creditors").

The impact of EnerSys's rejection damage claim against the estate will not be so large that it would cause a reasonable business person not to reject the Agreement.

### 4. Reversion of the Exide Mark

EnerSys contends that the rejection of the Agreement will not result in a benefit to the estate because, upon rejection, Exide will not have the exclusive right to use the Exide trademark. EnerSys's argument is two-fold. First, EnerSys claims that title to the Exide mark (for use on industrial batteries) already passed to EnerSys in June 1991, when the parties entered into the Agreement. As such, rejection has no effect on EnerSys's right to use the mark. Second, EnerSys claims that rejection of the Agreement does not result in its termination and, therefore, EnerSys retains its right to use the Exide mark. Both arguments lack merit.

#### a. *Title to the Exide Mark.*

EnerSys's argument concerning the transfer of title to the Exide mark is an offshoot of its argument that the Agreement was a "closed sale" transaction. However, for the reasons already discussed herein, with respect to the Exide Mark, the Agreement is not a sale, but a license.

As previously noted, the Agreement identifies which marks were assigned to EnerSys (*see* paragraph and schedule 9.1 of the Asset Purchase Agreement) and which marks were licensed to EnerSys (*see* paragraph and schedule 9.5 of the Asset Purchase Agreement). The Exide mark is listed in the category of those marks that were licensed to EnerSys. And with respect to those marks that were licensed to EnerSys, including the Exide mark, para-

---

**39.** The Committee and the Debtor were at bitter odds throughout nearly all of the preconfirmation phase of this chapter 11. *See In re Exide Technologies,* 303 B.R. 48 (Bankr. D.Del., 2003). Although the plan ultimately confirmed was largely a consensual plan, I easily conclude that this is no committee which would willingly (or quietly) suffer any unnecessary harm at the hands of the Debtor.

graph 9 of the Trademark License provides, in relevant part, that:

> [l]icensee shall acquire no right, title or interest with respect to the Licensed Marks or the Licensed Trade Name as a result of Licensee's use thereof in commerce or otherwise and Licensee acknowledges and agrees that all rights in and to the Licensed Marks and the Licensed Trade Name and the good will pertaining thereto belong exclusively to, and shall inure to the benefit of, Licensor.

Thus, there was never a transfer of ownership in the Exide mark. Rather, title to the Exide mark remained with Exide.

### b. *Termination Upon Rejection.*

■ EnerSys has pointed to authority for the proposition that rejection does not terminate an executory contract (*see Lavigne,* 114 F.3d at 387; *Columbia Gas,* 50 F.3d at 239 n. 8); however, none of the authority cited in support of such proposition involved trademark licenses. Rather, there is authority directly contradicting this proposition in the context of the rejection of trademark licenses. *See, e.g., HQ Global Holdings,* 290 B.R. at 513 (holding that rejection terminates a trademark license); *Raima UK Ltd. v. Centura Software Corp. (In re Centura Software Corp.),* 281 B.R. 660, 673–674 (Bankr. N.D.Cal.2002) (holding that rejection terminates a trademark license). In its trial brief, EnerSys argues that the decisions in *HQ Global Holdings* and *Centura Software* are flawed because their holdings are not reconciled with cases that hold that rejection does not equate to a termination of an executory contract. The unique nature of intellectual property licenses requires different treatment than non-intellectual property-related contracts upon rejection.

Moreover, Bankruptcy Code § 365(n) does not provide EnerSys with any protection from the consequences of rejection. Section 365(n)(1) provides that, upon rejection of an executory contract in which the debtor is a licensor of intellectual property, a licensee may elect either:

> (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
>
> (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced . . .

11 U.S.C. § 365(n).

The term "intellectual property", as used in § 365(n), is defined as a:

> (A) trade secret; (B) invention, process, design, or plant protected under title 35; (D) plant variety; (E) work of authorship protected under title 17; or (F) mask work protected under chapter 9 of title 17; to the extent protected by applicable nonbankruptcy law.

11 U.S.C. § 101(35A). It is clear from the plain language of this definition that trademarks are excluded. *See HQ Global Holdings,* 290 B.R. at 513 (finding that trade names, trademarks and other proprietary marks are not included within the definition of intellectual property). *See also Centura Software,* 281 B.R. at 669–670

(noting that "Congress has ... expressly withheld § 365[n] protection from rejected executory trademark licenses"). Thus, trademark licensees, such as EnerSys, cannot use § 365(n) to elect to retain their rights to use a mark after rejection.[40]

Various decisions support the view that Exide is excused from its contractual obligations under the Agreement, including its obligation to allow EnerSys to use the Exide mark. *See Lavigne*, 114 F.3d at 387 (noting that rejection frees the estate from its obligation to perform); *HQ Global Holdings*, 290 B.R. at 513 ("[t]he result of the [d]ebtors' rejection of the [a]greements is that they are relieved from the obligation to allow the [f]ranchisees to use their proprietary marks"). Rejection of the Agreement leaves EnerSys without the right to use the Exide mark. *Id.; Centura Software*, 281 B.R. at 674–675 (holding that licensee is not entitled to retain any rights in the trademarks as a result of the rejection of the trademark agreement); *Blackstone Potato Chip*, 109 B.R. at 562 (approving the debtor's motion to reject a license agreement and ordering the return of trademarks and trade names to the debtor); *see also Chipwich*, 54 B.R. at 431 (holding that upon rejection of the trademark licenses, the licensee only has a claim for damages).

The primary benefit to rejecting a trademark license is reacquiring the right to use the mark in whatever capacity or market in which use by the licensor was previously excluded and extinguishing the licensee's right to use it. Taken to its logical end, EnerSys' argument that a licensee's right to use a trademark does not revert back to the licensor upon rejection means that a rejection of a trademark license would never offer meaningful relief to the debtor. This would be an absurd result. Under these circumstances, Exide's obligation to allow EnerSys to use the Exide mark is extinguished upon rejection.

## IV. *Transition Period*

Since the exclusive use of the Exide mark in connection with industrial battery market will revert back to Exide, it is appropriate to fashion a transition period to mitigate any potential damage and business disruption that EnerSys may suffer as a result of losing the Exide mark. Other courts have utilized transition periods in connection with the rejection of an executory contract or unexpired lease. *See, e.g., HQ Global Holdings*, 290 B.R. at 514 (allowing for a 30–day transition period to phase out the franchisees' use of a proprietary mark); *In re Texas Health Enters.,*

---

**40.** EnerSys concedes that § 365(n) does not apply to trademark licenses, but argues that a negative inference should not be drawn from the fact that Congress granted protection to certain licensees in § 365(n) but not trademark licensees. I disagree.

Congress enacted § 365(n) in response to the Fourth Circuit's decision in *Richmond Metal Finishers. See HQ Global Holdings.,* 290 B.R. at 513 n. 5; *Centura Software*, 281 B.R. at 668. In *Richmond Metal Finishers,* the Fourth Circuit held that the licensee only had a claim for monetary damages under § 365(g) upon the debtor's rejection of a technology license. *Richmond Metal Finishers,* 756 F.2d at 1048. Rejection of the technology license agreement resulted in its termi-

nation and the licensee no longer had the right to use the technology. *Id.*

In enacting § 365(n), Congress sought to protect intellectual property licensees from such a result. Congress certainly could have included trademarks within the scope of § 365(n) but saw fit not to protect them. Therefore, the holding in *Richmond Metal Finishers,* as well as the holdings in the other pre and post § 365(n) trademark rejection cases cited herein, still retain vitality insofar as they relate to trademark licenses. As a result, a trademark license is terminated upon rejection and the licensee is left only with a claim for damages. *See HQ Global Holdings,* 290 B.R. at 513; *Centura Software*, 281 B.R. at 673.

*Inc.*, 255 B.R. 185, 189 (Bankr.E.D.Tex. 2000) (approving a transition plan for the turnover of a nursing home after the rejection of the lease for the same).[41]

Exide proposes a two-year transition period based on the termination provision in the Trademark License that calls for a "reasonable period not to exceed two (2) years" for discontinuing EnerSys's use of the mark.[42] EnerSys suggests a five-year transition period. Given that the parties have already agreed upon a maximum two-year time frame, I conclude that two years from the date of this decision is an appropriate transition period and I will so order.[43]

An appropriate Order follows.

### ORDER

**AND NOW**, this 3rd day of April, 2006, upon consideration of the Exide's Motion to Reject (Docket Nos. 1614, 1615, 1617 and 1618), the opposition of EnerSys, Inc.

thereto after hearing thereon and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED AND DECREED** that:

1. The Motion to Reject is GRANTED;

2. EnerSys shall have two years from the date hereof to discontinue any use of the Exide mark (as described in the accompanying Memorandum);

3. EnerSys, Inc. Shall have thirty days from the date of this Order to file its rejection damage claim;

4. A hearing will be held on **April 27, 2006 at 10:00 A.M.** in Bankruptcy Courtroom No. 5, 824 Market Street, Fifth Floor, Wilmington, Delaware to consider whether the Court should impose a transition plan, and if so, what the terms of such a plan should be; and

5. The parties shall have until **April 24, 2006** to file and serve position papers with

---

**41.** The Court requested input in post-hearing submissions from both parties concerning the imposition of a transition period if rejection was approved. Section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a). This provision essentially codifies "the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990).

**42.** Paragraph 8 of the Trademark License provides, in relevant part, that:

[u]pon termination of this Trademark License, Licensee and its sublicensees shall, within a reasonable period of time not to exceed two (2) years, discontinue all use of the Licensed Marks and Licensee shall discontinue all use of the Licensed Trade Name . . . .

**43.** Relying upon the terms of Trademark License to establish the two-year transition peri-

od is reasonable given the fact that both parties, who are highly sophisticated businesses, agreed upon such time-frame after much negotiation and, presumably, careful consideration in the course of their arm's-length transaction. Further, EnerSys does not provide any reason for following its suggested 5–year period or any other time period for that matter. Indeed, a transition period as long as the one suggested by EnerSys could actually be more harmful. The longer EnerSys continues to use the Exide mark, the more it would be doing so for Exide's benefit, since the mark ultimately reverts back to Exide. EnerSys's own expert witness testified as much. *See* 3/25/04 Tr. 57:6–12.

However, establishing only a time-frame for the transition may not be sufficient. For the transition to be as smooth as possible, a plan should be created that sets forth how the transition will be carried out. However, before deciding whether the parties should be left to their own devices or whether the Court should impose such a plan and, if so, the terms of such a plan, I will schedule a hearing to solicit the parties' views about how best to proceed.

respect to any further relief to be ordered by the Court.