# United States Court of Appeals

### For the Eighth Circuit

_____

No. 11-1850

_____

In re: Interstate Bakeries Corporation

*Debtor*

------------------------------

Lewis Brothers Bakeries Incorporated and Chicago Baking Company

*Appellant*

v.

Interstate Brands Corporation

*Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 10, 2012
Filed: August 30, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

In 1996, Interstate Bakeries Corporation granted licenses to some of its trademarks to Lewis Brothers Bakeries, Inc., in certain Illinois territories. In 2004, Interstate Bakeries Corporation filed for Chapter 11 bankruptcy, and later contended its licensing agreement with Lewis Brothers Bakeries was an executory contract, subject to assumption or rejection under 11 U.S.C. § 365. The bankruptcy court agreed and concluded the agreement was an executory contract. The district court[1] affirmed, also concluding the agreement constituted an executory contract because a material obligation remained. We affirm.

I

In 1995, Interstate Bakeries Corporation ("Interstate") announced its acquisition of Continental Baking Company, the owner of the Wonder Bread and Hostess brands and trademarks. The United States Department of Justice brought an antitrust action against Interstate challenging the proposed acquisition. United States v. Interstate Bakeries Corp. & Cont'l Baking Co., No. 95 C 4194, 1995 WL 803559 (N.D. Ill. Aug. 7, 1995). On January 9, 1996, the United States District Court for the Northern District of Illinois entered final judgment in the action, requiring Interstate to divest itself of certain rights and assets to allow the acquisition to go through, in order to create viable competition of "White Pan Bread" in and around the Chicago, Illinois, area.

Interstate Brands Corporation (IBC), a subsidiary of Interstate, subsequently entered into a $20 million Asset Purchase Agreement and License Agreement with Lewis Brothers Bakeries (LBB), whereby IBC sold to LBB its Butternut Bread baking and business operations and assets in the Chicago territory and its Sunbeam Bread baking and business operations and assets in the Central Illinois territory. In

_____

[1]The Honorable Greg Kays, United States District Judge for the Western District of Missouri.

accordance with the terms of the final judgment, the License Agreement granted to LBB a "perpetual, royalty-free, assignable, transferable, exclusive" license to use the brands and trademarks in the respective areas. The parties allocated $11.88 million of the roughly $20 million purchase price to various tangible assets, with the remaining $8.82 million allocated to intangible assets, including the license.

On September 22, 2004, Interstate and eight other subsidiaries and affiliates, including IBC, filed Chapter 11 voluntary bankruptcy petitions. In November 2008, IBC filed an amended plan of reorganization, in which it contended the License Agreement with LBB was an executory contract, subject to assumption by the estate under 11 U.S.C. § 365.

LBB thereafter filed an adversary proceeding within the bankruptcy case for a declaratory judgment that the License Agreement was not an executory contract. The bankruptcy court disagreed with LBB and entered judgment in favor of IBC. In particular, the bankruptcy court found IBC maintained obligations to defend the trademarks, control the quality of goods, notify LBB of any threatened infringement of the marks, maintain full control over any infringement actions, refrain from settling any infringement action adverse to LBB's rights under the License Agreement, refrain from suing LBB for infringement or using the marks in the relevant territories, and indemnify LBB against all claims arising out of any willful acts or omissions under IBC's obligations. The bankruptcy court further found a number of continuing obligations on LBB's part, including the duty to refrain from sublicensing the marks, limiting the use of the marks to the specified territories, refrain from registering the marks, executing documents to preserve the marks within the relevant territories, use the marks only as prescribed, maintain the character and quality of goods sold under the marks, notify IBC of any threatened infringement of the marks, and assist IBC in infringement litigation.

The district court affirmed, holding the License Agreement was an executory contract because a material obligation remained since the failure to maintain the character and quality of goods sold under the trademarks would constitute a material breach. In particular, the court was persuaded by section 5.2 of the License Agreement, which indicated that LBB's failure to maintain the quality of goods sold would constitute a material breach, entitling IBC to terminate the agreement. Because the parties themselves had agreed such an obligation was material, the court concluded the License Agreement was an executory contract. The court further concluded LBB's promissory estoppel claim failed because LBB could not show IBC unambiguously promised to sell the trademarks to LBB. The court again looked to the plain language of the License Agreement, which provided IBC retained exclusive ownership over the trademarks, and LBB had no rights to the marks. See License Agreement § 2.1. LBB appeals.[2]

II

We review a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1168 (8th Cir. 2011). "Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." In re Craig, 144 F.3d 593, 595 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)).

The central issue in this appeal is whether the License Agreement is an executory contract subject to assumption or rejection under section 365 of the Bankruptcy Code. "This circuit has defined an executory contract as 'a contract

---

[2]Interstate filed another bankruptcy petition after oral argument in this matter, triggering the automatic stay provisions of 11 U.S.C. § 362. The bankruptcy court has since approved the parties' stipulation modifying the stay to allow this court to issue a ruling in this appeal.

under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" Id. at 596 (quoting Nw. Airlines, Inc. v. Klinger (In re Knutson), 563 F.2d 916, 917 (8th Cir. 1977)); see also Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973). This definition, known as the Countryman test, recognizes that, "[i]n the context of the Bankruptcy Act, . . . the term 'executory contract' takes on a more limited meaning in light of the purposes for which the trustee is given the option to assume or reject." Jenson v. Cont'l Fin. Corp., 591 F.2d 477, 481 (8th Cir. 1979). Under the Countryman test, "a contract to which the nonbankrupt party has [f]ully rendered its performance, but the bankrupt has performed partially or not at all, is not 'executory' in the sense of the Bankruptcy Act." Id. at 481 n.5.

The parties' dispute over whether the License Agreement is an executory contract is similar in many respects to a case considered by the Third Circuit, In re Exide Technologies, 607 F.3d 957 (3d Cir. 2010). There, the court considered whether an agreement between two companies for the sale of an industrial battery business was an executory contract. Id. at 960. The companies, Exide and EnerSys, entered over twenty-three agreements to complete the sale, including four agreements the parties agreed were integrated—a license agreement, asset purchase agreement, administrative services agreement, and letter agreement. Id. at 960-61. Under the integrated agreement, Exide licensed its trademark to EnerSys for use in the industrial battery business, while it continued to use the mark outside that business. Id. at 961. The agreement provided a "perpetual, exclusive, royalty-free license to use the Exide trademark in the industrial battery business." Id. This agreement continued almost a decade without incident, until, among other events, Exide filed for bankruptcy and rejected the agreement. Id.

-5-

After reciting the Countryman test, the Third Circuit analyzed whether the agreement contained at least one obligation that would constitute a material breach if not performed. Id. at 962. Considering relevant state law, the court noted "when a breaching party has substantially performed before breaching, the other party's performance is not excused." Id. at 962-63 (internal quotation marks and citation omitted). The court concluded EnerSys had substantially performed to the extent that it outweighed its remaining performance, by taking such steps as paying the full purchase price, operating under the agreement for over ten years, using all the assets transferred under the agreement, and assuming Exide's liabilities. Id. at 963. Notably, the court concluded "EnerSys's obligation to observe the Quality Standards Provision is minor because it requires meeting the standards of the mark for each battery produced; it does not relate to the transfer of the industrial battery business." Id. at 964. Moreover, the court noted EnerSys was not provided with, nor did the parties even discuss, any quality standards, and thus it was "an untenable proposition to find an obligation to go to the very root of the parties' Agreement when the parties themselves act as if they did not know of its existence." Id.

Relying on In re Exide, LBB contends the License Agreement is not an executory contract under the Countryman test because each party substantially performed its obligations, leaving no further material duties. LBB argues the License Agreement was part of an integrated agreement wherein IBC sold certain business operations to LBB with a perpetual, royalty-free, assignable, transferable, exclusive license to use the trademarks necessary to run the transferred businesses. Indeed, LBB claims IBC's own records demonstrate it treated the transaction as a complete sale, and the parties have acted accordingly for fourteen years. LBB asserts the core purpose of the antitrust judgment, from which the transaction came about, was to remove IBC from involvement in the divested business, and if IBC still controlled the trademarks in these territories, the antitrust and competition requirements of the judgment would be meaningless. Any of the remaining obligations cited by the bankruptcy court here were minor or were only conditional duties, LBB claims, such

-6-

as the duties in possible infringement actions involving the trademarks. As for the quality obligation cited by the district court, LBB contends the provision is vague and has no specificity to measure performance.

To begin our analysis, we must first inquire whether an executory contract is determined according to federal or state law. We find instructive our decision in Cameron v. Pfaff Plumbing & Heating, Inc., 966 F.2d 414 (8th Cir. 1992), where this court concluded the Countryman test "is a question of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish uniform Laws on the subject of Bankruptcies throughout the United States." Id. at 416 (internal quotation marks and citation omitted). At the same time, Cameron "acknowledge[d] the relevance of state law which addresses whether a particular type of contract is executory." Id. at 416 n.1.[3]

In light of Cameron's recognition of the continued relevance of state law in the executory contract determination, we conclude the district court properly considered the parties' agreement on materiality in making its determination. Section 5.2 of the License Agreement provides, "[a] material breach shall include but not be limited to a failure of LBB to maintain the character and quality of goods sold under the Trademarks as provided for in Section 6.1 hereof." Section 6.1 states:

> Goods sold or otherwise distributed by Licensee under the Trademarks shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks and such present character and quality shall be considered an acceptable standard of quality. Licensee shall use raw materials, ingredients and packaging supplies of

[3]Cameron distinguished a seemingly conflicting case in this circuit, In re Speck, 798 F.2d 279 (8th Cir. 1986), on the ground that "the holding that state law governs § 365 issues originated with an agreement to that effect by the parties in Speck," and thus Cameron limited Speck to the contracts at issue in that case. Cameron, 966 F.2d at 416 n.1.

a quality at least as high and consistent with the quality previously used by IBC in connection with the same or similar products.

Sections 5.2 and 6.1 of the License Agreement, among other facts, plainly distinguish this case from In re Exide, the seminal case LBB relies upon. In that case, the parties had not even contemplated or discussed any quality standards, so the court refused to import such an obligation into the agreement and thereafter conclude the obligation was material. Here, it cannot be argued the parties did not contemplate any quality standards, as it is an explicit provision of the License Agreement. Moreover, the plain language of the agreement provides a breach of the quality provision would be material. While our inquiry is broader than simply pointing to this agreement, under Cameron, this agreement is clearly relevant to our determination.

LBB's arguments to the contrary are essentially calls to void the quality provision for vagueness. However, as the district court recognized, our focus is not on the standards LBB must abide by to remain in compliance with the quality control provision, much less the frequency with which IBC has monitored the quality of goods over the years. Rather, our determination centers on whether any material obligations remain. Because LBB's breach of the provision would be material, we agree with the district court that it constitutes a remaining material obligation.

Moreover, IBC maintains existing material obligations on its part as well. Namely, IBC has unperformed obligations of notice and forbearance with regard to the trademarks. See In re Qintex Entm't, Inc., 950 F.2d 1492, 1495 (9th Cir. 1991) (discussing executory contracts involving notice and forbearance); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1045 (4th Cir. 1985) ("The unperformed, continuing core obligations of notice and forbearance in licensing made the contract executory as to [the defendant]."). IBC also has obligations relating to maintaining and defending the marks, and other infringement-related obligations. See In re Qintext Entm't, Inc., 950 F.2d at 1495 (concluding a contract was executory

where the party had to "refrain from selling the rights to subdistribute the movies to third parties, . . . indemnify and defend Qintex, and exercise[] creative control over the colorization and marketing of the pictures."); Lubrizol Enters., Inc., 756 F.2d at 1045 (discussing obligations of defending infringement suits and indemnification). Reading § 365 broadly, we conclude these obligations are material, thus rendering the agreement executory as to IBC. See Cameron, 966 F.2d at 417 ("We are inclined to interpret § 365 broadly, at least in a debtor's behalf.") (internal quotation marks and citation omitted).

In sum, both parties maintain at least one remaining material obligation. Thus, the district court correctly concluded the agreement constitutes an executory contract.

We further reject LBB's promissory estoppel argument. "To establish a [promissory estoppel] claim, the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 906 N.E.2d 520, 523-24 (Ill. 2009).

LBB claims IBC should be estoped from contending the agreement is executory because it treated the agreement as a fully-completed sale, and it did not list the License Agreement as an asset or executory contract on its bankruptcy schedules during the first four years of its bankruptcy, while LBB continued to invest in and develop the business. However, as the district court held, LBB cannot establish the first element of its estoppel claim—that a promise was made for the sale of the trademarks. Instead, the License Agreement speaks unequivocally of granting a license to LBB for the trademarks IBC owns, not selling the trademarks to LBB. The agreement explicitly states IBC "shall retain the full ownership interest in and to the Trademarks." License Agreement § 2.1. Indeed, certain prohibitions and restrictions contained in the agreement would not comport with ownership by LBB.

LBB's arguments based on the parties' course of conduct are not persuasive when faced with the plain language of the agreement. See All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 869 (7th Cir. 1999) ("When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.").

We affirm the district court.

COLLOTON, Circuit Judge, dissenting.

The question presented on this appeal is whether the agreement between Interstate Bakeries Corporation (IBC) and Lewis Brothers Bakeries (LBB) is an executory contract subject to assumption or rejection under 11 U.S.C. § 365(a). To answer that question, it is necessary first to identify what constitutes the agreement at issue. In December 1996, the parties entered into an Asset Purchase Agreement that transferred IBC's Butternut Bread and Sunbeam Bread business operations and assets in two territories to LBB, and a License Agreement that authorized LBB to use IBC's trademarks in those territories under a perpetual, royalty-free, and exclusive license. The court focuses on the License Agreement alone, but the relevant contract is an integrated agreement that includes both the Asset Purchase Agreement ("APA") and the License Agreement. That integrated agreement is not executory, so I would reverse the judgment of the district court.[4]

_____

[4]After this case was submitted, IBC filed for bankruptcy in the Southern District of New York, and this appeal was automatically stayed. *See* 11 U.S.C. § 362; *Farley v. Henson*, 2 F.3d 273, 274-75 (8th Cir. 1993). The parties then obtained limited relief from the automatic stay "to allow the Eighth Circuit to issue a Ruling in the Pending Appeal," but the bankruptcy court's order does not authorize the parties "to take any further action before the Eighth Circuit . . . with respect to . . . the Pending Appeal." Because the order does not authorize the parties to petition for rehearing, *see* Fed. R. App. P. 40, and because a mandate does not issue from this court until seven days after the time for filing a petition for rehearing expires, *see*

-10-

Under Illinois law, the question whether a contract is a separate agreement "depends on the intention of the parties as manifested by the specific contract terms." *Stratemeyer v. West*, 484 N.E.2d 399, 400 (Ill. App. Ct. 1985). "The general rule is that in the absence of a contrary intention, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together . . . because they are, in the eyes of the law, one contract." *Tepfer v. Deerfield Savs. & Loan Ass'n*, 454 N.E.2d 676, 679 (Ill. App. Ct. 1983); *see Kel-Keef Enters., Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 538 (Ill. App. Ct. 2000). "A contract should be treated as entire when, by a consideration of its terms, nature, and purposes, each and all of the parts appear to be interdependent and common to one another and to the consideration." *Trapkus v. Edstrom's Inc.*, 489 N.E.2d 340, 346 (Ill. App. Ct. 1986).

The APA and the Licence Agreement should be considered together as one contract. IBC and LBB entered into the APA and the License Agreement contemporaneously on December 28, 1996. The APA lists the license as an asset sold to LBB pursuant to the sale. It directs the parties to enter into the License Agreement "[u]pon the terms and subject to the conditions contained in [the APA]." Both documents define the "Entire Agreement" as including each other. The APA's definition includes "the exhibits and schedules hereto," and a model for the License Agreement is included as an exhibit to the APA. The License Agreement defines the entire agreement to include "the Exhibits and Schedules hereto and the agreements referenced herein," and it references the APA throughout the agreement. The License Agreement states that as consideration for the license, LBB "has paid to IBC a fee of ten dollars ($10.00), and other good and valuable consideration, set forth in the Allocation Agreement described in Section 2.3 of the Purchase Agreement." To treat

Fed. R. App. P. 41, any opinion filed by this panel may be purely advisory. I would take no action until the parties obtain sufficient relief from the automatic stay to permit completion of the entire appellate process. Because the majority elects to proceed, however, I address the merits of the appeal.

the License Agreement as a separate agreement not only would run counter to the plain language of both the APA and the License Agreement, which describe the two as one piece, but would ignore the valuable consideration paid for the license, which obviously exceeded ten dollars.

The ultimate question, then, is whether this integrated agreement is an executory contract under the Bankruptcy Code. This circuit has adopted Professor Countryman's definition of an executory contract for purposes of the Bankruptcy Code: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Craig*, 144 F.3d 593, 596 (8th Cir. 1998) (internal quotation omitted); *see* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

The parties dispute whether we should apply the doctrine of substantial performance in determining whether the contract is executory. Under this doctrine, the nonbreaching party's performance is not excused if the breaching party has "substantially performed." *In re Exide Techs.*, 607 F.3d 957, 963 (3d Cir. 2010). According to IBC, the doctrine does not apply, and we should look only at the remaining obligations on each side and ignore the obligations that the parties have already performed. The majority apparently takes this approach.

The doctrine of substantial performance, however, is inherent in the Countryman definition of executory contract. Substantial performance and material breach are interrelated concepts: "Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused." 15 Richard A. Lord, *Williston on Contracts* § 44:55 (4th ed. 2000). Consistent with that interrelationship,

-12-

the Countryman definition calls for the court to examine whether the obligation of the parties to the contract "are so far underperformed" that a failure to complete performance would be a material breach. *Craig*, 144 F.3d at 596. This inquiry requires a comparison of the performed obligations with the underperformed obligations. For example, Professor Countryman's seminal article explains when a nonbankrupt building contractor has "fully performed save that he has failed to connect the water or has made a defective connection," the bankrupt party on the other side of the contract would be entitled to damages, but not to refuse acceptance of the building or to excuse his performance. Countryman, *supra*, 57 Minn. L. Rev. at 457. That is so, because the building contractor has substantially performed.

IBC argues that this court must look to state law in applying the Countryman definition, and that the doctrine of substantial performance would not apply under Illinois law. *But cf. Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir. 1992) (holding that whether a contract is executory under § 365 "is a question of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish 'uniform Laws on the subject of Bankruptcies throughout the United States.'") (quoting U.S. Const. art. I, § 8, cl. 4). Yet Illinois does recognize the doctrine of substantial performance, and Illinois law defines it as "performance in all the essential elements necessary to the accomplishment of the purpose of the contract." *W.E. Erickson Constr., Inc. v. Congress-Kenilworth Corp.*, 503 N.E.2d 233, 236-37 (Ill. 1986) (internal quotation omitted). IBC argues that Illinois limits this doctrine to disputes under construction contracts, but IBC cites no case so holding. Just as the Third Circuit saw no reason to cabin the doctrine under New York law in *Exide*, 607 F.3d at 964, we should not confine the doctrine to construction cases when applying Illinois law.

To conclude that a contract is executory for purposes of § 365, the bankruptcy court must find that *both* parties have so far underperformed that a failure of *either* to complete performance would constitute a material breach excusing the

performance of the other. *In re Craig*, 144 F.3d at 596. The contract at issue here is not executory, because IBC substantially performed its obligations under the APA and License Agreement, and its failure to perform any of its remaining obligations would not be a material breach of the integrated agreement.

The majority identifies the following obligations of IBC as material: "obligations of notice and forbearance with regard to the trademarks," and "obligations relating to maintaining and defending the marks, and other infringement-related obligations." *Ante*, at 8. The opinion does not specify the source of an obligation to "maintain and defend the mark," and the agreement provides only that IBC has "*the sole discretion . . .* to bring proceedings involving the Trademarks in its own name," as well as "*the sole right, but not the obligation*," to control the defense of any infringement suit brought by a third party. In any event, when the bankruptcy court reasoned that these "obligations" were material, that court rested its conclusion on the "factually analogous," but now-reversed, decision of the Delaware bankruptcy court in *Exide*. *See In re Interstate Bakeries Corp.*, 2010 WL 2332142, at *6 (Bankr. W.D. Mo. 2010) (citing *In re Exide Techs.*, 340 B.R. 222, 229 (Bankr. D. Del. 2006)). The district court in this case affirmed the bankruptcy court, but it did so after concluding only that the remaining obligations of *one party*, LBB, were material. *In re Interstate Bakeries Corp.*, 447 B.R. 879, 884-86 (W.D. Mo. 2011). Even assuming the district court's analysis of LBB's obligations was correct, the court neglected to consider the contractual obligations of IBC.

The remaining obligations of IBC are not material to the integrated agreement, and the contract between IBC and LBB is thus not executory for purposes of § 365. Material breaches are those that "go[] to the root or essence of the contract." *Williston* § 44:55; *see also Anderson v. Long Grove Country Club Estates, Inc.*, 249 N.E.2d 343, 349 (Ill. App. Ct. 1969) ("A material or total breach is a failure to do an important, substantial or material undertaking set forth in a contract."). Here, the essence of the agreement was the sale of IBC's Butternut Bread and Sunbeam Bread

business operations in specific territories, not merely the licensing of IBC's trademark. The agreement called for LBB to pay $20 million for IBC's assets. The parties allocated $11.88 million for tangible assets, such as real property, machinery and equipment, computers and licensed computer software, vehicles, office equipment, and inventory. They allocated another $8.12 million toward intangible assets, including the license. IBC has transferred all of the tangible assets and inventory to LBB, executed the License Agreement, and received the full $20 million purchase price from LBB. IBC's remaining obligations concern only one of the assets included in the sale (the license), and when considered in the context of the entire agreement, they are relatively minor. The majority relies on decisions holding that certain obligations can be material, *see In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1495-96 (9th Cir. 1991); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045-46 (4th Cir. 1985), but the cited authorities involve stand-alone licensing agreements, not licensing agreements that are part of a larger asset sale agreement. They also concern contractual obligations that differ from those remaining for IBC.

We should follow the lead of the Third Circuit in *Exide*. At issue in *Exide* was the $135 million sale of Exide's industrial battery business to EnerSys, which included a trademark license agreement. 607 F.3d at 960. Along with the license, Exide sold to EnerSys physical manufacturing plants, equipment, inventory, and certain items of intellectual property. *Id.* at 960-61. The Third Circuit held that Exide's remaining obligations, which included duties to maintain quality standards, to refrain from use of the trademark outside the industrial battery business, and to indemnify EnerSys, did not "outweigh the substantial performance rendered and benefits received by EnerSys." *Id.* at 963-64. The court observed that the remaining contractual obligations did not relate to the purpose of the agreement, which was the sale of Exide's industrial battery business. *Id.* So too here.

For these reasons, I would reverse the judgment of the district court.

_____

-15-